## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Advance Wire Forming, Inc., et al.,** | **Case No. 1:18cv723** |
| **Plaintiffs,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Jeffrey Stein, et al.,** | |
| **Defendants** | **MEMORANDUM OPINION AND ORDER** |

Currently pending are the following Motions: (1) Defendants Jeffrey Stein and Plastics and Products Marketing, LLC's Motion for Summary Judgment on Plaintiffs' Complaint (Doc. No. 151); (2) Defendants' Motion for Summary Judgment on their Counterclaim (Doc. No. 152); and (3) the Motion of Plaintiffs Advance Wire Forming, Inc., Advanced Industries Group, LLC, and AIG Holdings, LLC for Summary Judgment on the Counterclaim and Partial Summary Judgment as to the Complaint (Doc. No. 153.)  Briefs in Opposition were filed on March 2, 2020, and Replies were filed on March 16, 2020.  (Doc. Nos. 155, 156, 157, 158, 159, 160.)

For the following reasons, Defendants' Motion for Summary Judgment on the Complaint is GRANTED IN PART and DENIED IN PART.  Defendants' Motion for Summary Judgment on the Counterclaim is DENIED.  Plaintiffs' Motion for Partial Summary Judgment on the Complaint is DENIED, and their Motion for Summary Judgment on the Counterclaim is DENIED.

## I.    Facts

Prior to June 2016, Defendant Jeffrey Stein and Plaintiff James Williams were each 50% owners of Defendants Advance Wire Forming, Inc. ("AWF"), Advanced Industries Group, LLC ("Industries"), and AIG Holdings, LLC ("Holdings").  (Deposition of Jeffrey Stein (Doc. No. 133-1)

at Tr. 5-6, 8.)   AWF, Industries, and Holdings are located at 3636 West 58th Street in Cleveland, Ohio.  (April 10, 2019 Deposition of James Williams (Doc. No. 135-1) at Tr. 4.)[1]

According to Plaintiffs, AWF manufactures wire, tubing, and plastic products, including point-of-purchase ("POP") displays, wire form products, and plastic components and merchandising units.  (Williams Depo. (Doc. No. 135-1) at Tr. 12; Stein Depo. at 8-9.)  Defendant Stein was the President of AWF.  (Stein Depo. at Tr. 7.)  He was responsible for sales, marketing, and production, and made all of AWF's operating and financial decisions.  (*Id.* at Tr. 7-8.)  *See also* Williams Aff. (Doc. No. 158-46) at ¶ 4.

Industries is a manufacturer of metal products, POP displays and fixtures, plastic components, and plastic merchandising units.  (Williams Aff. at ¶ 4.)  *See also* Williams Depo. (Doc. No. 135-1) at Tr. 10-11.   Plaintiff Williams made all the operating and financial decisions for Industries. (Williams Aff. at ¶ 4; Williams Depo. (Doc. No. 135-1) at Tr. 20-21.)  AIG Holdings owns the real property on which AWF and Industries are located.  (Stein Depo. at Tr. 6.)

In June and early July 2015, Stein sent several emails expressing concern regarding AWF's financial condition.  (Doc. Nos. 153-5, 153-10.)  In one of these emails, however, Stein noted that

---

[1] The Court notes that, although Plaintiffs cite extensively to deposition testimony from numerous witnesses, they fail to attach excerpts from said testimony to their summary judgment briefing.  Nor do Plaintiffs direct this Court's attention to the specific document numbers for any of the numerous depositions that are cited.  This is problematic because the depositions in this matter were filed multiple times.  For example, there are four separate docket entries for Plaintiff Williams' deposition and seven separate docket entries for AWF Vice-Preside of Sales James Monroe's deposition.  (Doc. Nos. 91, 106, 135, 143, 94, 95, 103, 107, 138, 140, 144.)  None of these docket entries indicate the dates of the depositions, making it unclear whether the filings are duplicative or represent depositions from different dates. In fact, Williams and Monroe were each deposed on two separate dates.  Plaintiffs' citations to Williams' and Monroe's testimony, however, fail to in any way indicate the specific deposition transcripts cited, either by the date of the deposition or by document number.  At a bare minimum, counsel should endeavor to cite supporting material in such a way that the Court can easily locate it.  Plaintiffs' counsel failed entirely in this regard.  Plaintiffs are hereby advised that, in any future filings before this Court, they must (1) clearly and precisely identify the location of supporting material in the record, and (2) file excerpts of any deposition testimony cited.  Failure to do so may result in an Order *sua sponte* striking all non-compliant filings.

AWF had "added plastic fabricating to our capabilities and are starting to get orders from Heinz and International Delight."  (Doc. No. 153-5 at PageID# 6565.)  He was "not sure how much additional revenue it will generate for the company" but was hopeful that plastic fabrication work "could possibly be our salvation with new sales of around $500,000."  (*Id.*)

In July 2015, however, Stein came into Plaintiff Williams' office and said "I'm done. I'm shutting down [AWF]."  (Williams Aff. at ¶ 5; James Monroe Aff. (Doc. No. 158-52) at ¶ 3.)  According to Williams and James Monroe (Vice President of Sales for AWF and Industries), Stein indicated that AWF had lost a major customer worth $800,00 to $1,000,000 in annual billings and sales.  (Williams Aff. at ¶ 7; Monroe Aff. at ¶ 5.)  Stein also allegedly told Williams and Monroe that "the stress over the dire financial condition of [AWF] and his cancer was too much for him to handle and that he wanted out of all companies so that he could retire." (Williams Aff. at ¶ 8; Monroe Aff. at ¶ 6.)  Williams avers that Stein "looked very pale, weak, sick and stressed out."  (Williams Aff. at ¶ 8.)

Williams reviewed the checkbook for AWF and saw a balance of $7,000, and then reviewed payables which totaled over $400,000.  (Williams Aff. at ¶ 5.)  He subsequently made a bridge loan of $100,000 from Industries to AWF to cover payroll and other payables.  (*Id*. at ¶ 6.)  Shortly thereafter, on July 15, 2015, Williams made a written settlement offer to Stein to buy him out of AWF and Industries.  (*Id.* at ¶ 9.)  According to Williams, Stein first indicated that "although he wanted out and wanted to retire, he wanted to think about it and consider working for Industries and AWF as a paid employee or consultant."  (*Id.*)  Later that day, however, Stein allegedly indicated that he wanted to be bought out so that he could retire and move to Florida.  (*Id*. at ¶ 10.)

3

During this same general time period, Stein was working with a plastics broker named Joseph Winiarski[2] to produce a large order of fabricated plastic racks for a customer called International Delight.  (Deposition of Joseph Winiarski (Doc. No. 132-1) at Tr. 28-34.)  Winiarski testified that he designed this product, and that AWF was supposed to manufacture it and deliver it to International Delight.  (*Id*. at Tr. 31-32.)  On July 15, 2015, Stein sent an email to Joseph Winiarski, requesting that he submit a purchase order for this project.  (Doc. No. 153-12.)  *See also* Winiarski Depo. at Tr. 28-34.  According to Williams and Monroe, AWF's ability to successfully fill this order was heavily dependent on Stein's knowledge of the manufacturing process for this specific product.  *See* Williams Depo. (Doc. No. 135-1) at Tr. 26-28.

The following day, however, Stein did not come to work.  On July 17, 2015, Stein executed a Power of Attorney, authorizing his son, Michael Stein, to make decisions for him concerning his real and personal property.  (Doc. No. 153-13.)  On July 18, 2015, Defendant Stein presented to the emergency room with complaints of depression, anxiety, difficulty concentrating, feelings of hopelessness, and suicidal ideation.  (Doc. No. 153-16.)  He was subsequently admitted to the psychiatric division of Lutheran Hospital and treated with counseling and medication.  (Doc. Nos. 153-16, 153-18.)  Stein was discharged on July 24, 2015 with diagnoses of generalized anxiety

---

[2] Winisarski testified that he had been "doing business" with AWF through Defendant Stein from approximately 2009 to 2015.  (Deposition of Joseph Winiarski (Doc. No. 132-1) at Tr. 71.) He explained that, in 2002 or 2003, he was hired as a sales engineer/national sales representative for a plastics company called Plastics & Products Marketing.  (*Id*. at Tr. 12-14.)  This company was located in Florida and owned by Lynne Boykin.  (*Id*.)  In 2008 or 2009, while still employed by Ms Boykin, Winiarski formed his own company, Convenience Packaging Alliance LLC.  ("CPA").  (*Id*. at Tr. 19-23.) CPA sold plastic, wire, and wood products that Ms. Boykin did not want to sell.  (*Id*.)  Winiarski testified that AWF was one of CPA's primary customers.  (*Id*. at Tr. 24.)  Ms. Boykin terminated Winiarski's employment in March 2015, but he continued to operate CPA.  (*Id*. at Tr. 15, 25.)  Winiarski testified that, in approximately April or May 2015, Stein reached out to him because he wanted Winiarski to come work directly for AWF.  (*Id*. at Tr. 27-28.)  Winiarski subsequently had a telephone call with Stein and Williams; however, he was not offered a position. (*Id*. at Tr. 35-37.)

disorder, mood disorder, and major depressive disorder, single episode, severe without psychotic symptoms.  (Doc. No. 151-8.)

While Defendant Stein was in the hospital, Michael Stein came to the offices of AWF to check his father's email and make sure "nothing was slipping through the cracks."  (Deposition of Michael Stein (Doc. No. 131-1) at Tr. 17-19.)  Michael spoke with Williams and Monroe and advised them that Defendant Stein was "sick and in the hospital."  (*Id.* at Tr. 21.)  Sometime later, Michael returned to AWF and took possession of a prototype for a cooler that his father had been developing for AWF.  (*Id.* at Tr. 87.)  *See also* Monroe Aff. at ¶ 13.  When asked why he did this, Michael explained: "My father had been tinkering with things in and out of the house for 30 plus years.  I got him something else to tinker with."  (M. Stein Depo. at Tr. 87.)

Stein never returned to work at AWF, Industries, or Holdings.  Williams and Monroe testified that, due in part to Stein's absence,[3] the large plastics order for International Delight was a complete failure.  (Williams Depo. (Doc. No. 135-1) at Tr. 26-27.)  Williams explained that he "had no experience in manufacturing the product" and, although they tried to fill the order, they "failed miserably."[4]  (*Id.* at Tr. 26-27.)  Monroe also testified that, in August 2015, they lost an "absolute[ly]

---

[3] Williams testified that AWF's ability to successfully produce the order was also negatively impacted by the departure of Rod Miller, AWF's Production Supervisor.  (Williams Depo. (Doc. No. 135-1) at Tr. 27-29.)  Mr. Miller left AWF approximately three weeks after Defendant Stein was admitted to the hospital.  (Deposition of Rod Miller (Doc. No. 130-1) at Tr. 57.)

[4] As James Monroe explained:  "In 2015 . . .  we were processing an order for approximately $70,000 that was a plastic order that came from Joe Winiarski to [AWF] and we were in the process of fulfilling that order.  Unfortunately we weren't able to do so because Jeff [Stein] and Rod Miller left  . . . and we did not have the expertise nor the knowledge to complete that order.  We did the best we could with the information we had.  We shipped it.  Half of it came back.  We fixed it.  We reshipped it, which was all at our cost, which I couldn't even speculate on the cost of that."  (April 17, 2019 Deposition of James Monroe (Doc. No. 140-1) at Tr. 24-25.)  Winiarski testified similarly, stating "It was a sh** circus.  Falling apart.  I mean, the displays got more travel time there and back. Customers were getting pissed at me, telling me no more orders.  It was a disaster. Total disaster."  (Winiarski Depo. at Tr. 83.)

massive opportunity" to sell to United Dairy Farmer and Speedway because Stein was not available to assist in responding to a pricing request. (April 17, 2019 Deposition of James Monroe (Doc. No. 140-1) at Tr. 109.)

Williams or Monroe did not see or speak directly with Defendant Stein until March 2016, when the parties engaged in formal mediation proceedings. (Williams Aff. at ¶ 11; Monroe Aff. at ¶ 8.) Rather, between the date Stein left AWF in July 2015 and March 2016, Williams' and Monroe's communications regarding AWF and a potential buy-out of Defendant Stein's interests were with Stein's son, Michael. (Williams Aff. at ¶ 12; Monroe Aff. at ¶ 9.) Specifically, Williams avers that he and Monroe had numerous contacts with Michael in July and August 2015 "via telephone, text, and in person regarding Jeff Stein's exit plan." (Williams Aff. at ¶ 12.) Both Williams and Monroe state that, during these communications, Michael represented that his father "was stressed out, suicidal, was suffering from a nervous breakdown." (Williams Aff. at ¶ 15; Monroe Aff. at ¶ 10.) Michael also allegedly told them that Defendant Stein wanted to retire and move to Florida, and that "his father was too concerned about his physical and mental well-being and was in no shape to ever work again." (Williams Aff. at ¶ 15, 18.) *See also* Monroe Aff. at ¶ 15.

In October 2015, however, Stein "started feeling better" and began to explore other business opportunities. (Stein Depo. at Tr. 126.) Specifically, Stein began evaluating a number of different types of companies to possibly purchase, including pharmacies, food service equipment companies, and online retailers. (Doc. No. 151-11.) Notably, Winiarski testified that, in November 2015, Stein called him "out of the blue" and said "Hey, I'm opening a new plastics company. I want you to work for me." (Winiarski Depo. at Tr. 37, 92, 93.) Winiarski stated that Stein told him "I've got plenty of money. It's not going to be an issue." (*Id*. at Tr. 92.) When asked why he left AWF so suddenly,

6

Stein allegedly said that "he was getting f***ed by his partners and he needed to get the hell out."
(*Id*. at Tr. 93.)  In deposition, Stein denied that this conversation occurred, insisting that he "was not
capable of doing anything in November of 2015."  (Stein Depo. at Tr. 89-90, 126.)

After this alleged conversation, Winiarski immediately contacted Williams and Monroe and
told them what Stein allegedly said.  (Winiarski Depo. at Tr. 95.)  Williams then advised his attorney,
Joseph Burke, who confronted Stein's counsel, Larry Crystal.  (Williams Aff. at ¶ 20.)  Crystal later
forwarded Burke an email from Stein, which stated (among other things) as follows:

> I am also very upset and disturbed by the conversation you had with Joe Burke
> regarding Joe Winiarski.  I want to be very clear on this point and you are welcome to
> share this with Joe Burke if you wish:  At no point since I became ill and gave Michael
> power of attorney have I had any contact directly or indirectly with Joe Winiarski.  I
> have had zero contact with him or with any customers or vendors of AIG or since that
> time.  Further, I have absolutely no desire or intention to go into business with Joe
> Winiarski.  It disturbes [sic] me that any such action was claimed.

(Doc. No. 153-23.)

In January 2016, Stein reached out for information regarding Plastics & Products Marketing,
LLC, a Florida company owned by Lynne Boykin (hereinafter referred to as "Boykin
Manufacturing").[5]  (Stein Depo. at Tr. 13, 15.)  Specifically, in early January 2016, Stein contacted
the broker representing Boykin Manufacturing and stated, "I am currently in the process of selling
my interest in two companies in the area and am looking for opportunities such as this in Florida.
This might be a good fit for me."  (Doc. No. 153-24.)  Stein returned an executed non-disclosure
agreement, after which the broker sent Stein financial information regarding Boykin Manufacturing.

---

[5] As discussed *infra,* when Ms. Boykin operated this company, it was called Plastics & Products Marketing.  After it was
acquired by Defendant Stein, he operated it under the name Plastics and Products Marketing, LLC ("PPM"), which is a
named Defendant in the instant action.  For ease of reference, the Court will refer to the company owned by Ms. Boykin
as "Boykin Manufacturing" and will refer to the company later owned by Defendant Stein as PPM.

(Doc. Nos. 153-24, 153-26.)  On January 19, 2016, Stein had a telephone conference with Lynn Boykin.  (Stein Depo. at Tr. 16; Deposition of Lynne Boykin (Doc. No. 129-1) at Tr. 120-121.)

On January 22, 2016, Stein, through counsel, made a demand for mediation and arbitration to discuss a buy-out of his interests in AWF, Industries, and Holdings.  The parties and their counsel engaged in formal mediation proceedings on March 18 and 23, 2016.  (Doc. No. 153-30.)  At the conclusion of the March 23, 2016 mediation, the parties reached an agreement and executed a "short-form" Settlement Agreement (hereinafter referred to as "the March 2016 Agreement").  (*Id*.)  This Agreement contains provisions for a monetary payment from Williams to Stein in exchange for Stein "surrendering his units in [AWF], Industries, and Holdings," as well as release, confidentiality and non-disparagement provisions.  (*Id*.)  In addition, the March 2016 Agreement provides as follows:

    **8.**    **COVENANT NOT TO COMPETE**

        Stein shall not compete, directly or indirectly, with Wire, Industries, or Holdings for a period of five (5) years from the date of this Agreement.

    **9.**    **COOLER PROTOTYPE**

        Stein will use his best efforts to locate a certain cooler prototype, but does not represent that it is in his possession.  If he locates it, he will return it to Williams.

(*Id*. at PageID# 6665.)

Between March and June 2016, the parties, through counsel, exchanged drafts of a formal Settlement Agreement.[6]  During this time period, Defendant Stein continued to pursue his interest in

---

[6] During this time period, Huntington Bank advised Williams that it could not release Defendant Stein as a guarantor on certain company loans based on the current financial performance of AWF, Industries, and Holdings.  (Doc. No. 153-32.) Williams testified (and Stein does note dispute) that Williams thereafter paid off Stein's Huntington Bank loans, in the amount of $220,000.  (April 10, 2019 Williams Depo. (Doc. No. 135-1) at Tr. 47; Aug. 9, 2019 Williams Depo. (Doc. No. 143-1) at Tr. 15.)

purchasing Boykin Manufacturing.  (Doc. Nos. 153-33, 153-34.)  On May 29, 2016, Stein and Boykin signed a formal Letter of Intent for the purchase and sale of Boykin Manufacturing. (Doc. No. 153-34.)  Williams and Monroe testified that they were not aware that he was pursuing any business opportunities, believing that he intended to retire for health reasons.  (Williams Depo. (Doc. No. 135-1) at Tr. 143-144; Monroe Depo. (Doc. No. 140-1) at Tr. 69-71.)

One month later, on June 27, 2016, Stein and Plaintiffs executed a formal (1) Settlement Agreement and Mutual Release, and (2) Non-Competition Agreement.  (Doc. Nos. 153-36, 153-37.) In the former, Stein agreed to assign, transfer, and sell all of his shares in AWF, Industries, and Holdings, in exchange for a monetary payment from Plaintiffs. (Doc. No. 153-36 at ¶¶ 1, 2.)  In addition, the June 2016 Settlement Agreement contained mutual release provisions, as well as the following specific provisions relevant to the instant matter:

> 10.    The parties hereby agree that all proprietary property of the respective parties, including trade secrets, customer lists, customer files, pricing and sales data, supplier information, any financial information shall be kept confidential and shall not be shared with anyone not a party to this Agreement unless so ordered by a court of law.
>
>     ***
>
> 15.    Stein will utilize his best efforts to locate and return a cooler prototype to the parties.
>     ***
>
> 19.    This Agreement contains the entire understanding of the parties with regard to the subject matter of this Agreement and supersedes all prior agreements. ***

(*Id*. at ¶¶ 10, 15, 19.)

In relevant part, the Non-Competition Agreement provides as follows:

> **2.3**    **Agreements of Stein**.    Stein covenants that during the Non-Competition Period, Stein will hold in confidence the proprietary information of Company and will not disclose it to any third party except with the specific prior written consent of Company.  None of the foregoing obligations and restrictions applies to any part of

9

the proprietary information that Stein demonstrates was or became generally available to the public other than as a result of a disclosure by Stein.

\*\*\*

**3.2**   **Covenants of Stein**.  Stein covenants that he will not, directly or indirectly whether or not for consideration, during the Noncompetition Period:

> (a)  (i) **operate, control, advise, be engaged by, perform any consulting services for, invest in or otherwise become associated in any capacity with, any business, company, partnership, organization, proprietorship, or other entity, who or which, at any time during the Noncompetition Period, conducts the Business in any manner within a thirty (30) mile radius of either the  real property  located at  3636 West 58th Street, Cleveland, Ohio, or (ii) engage in any practice the purpose of which is to evade the provisions of this covenant**;

> (b) (i) solicit, induce or attempt to solicit or induce any employee of Company to terminate his or her relationship with Company;  (b) induce or attempt to induce any supplier, contractor or customer of Company to terminate or adversely change its relationship with Company; or (c) employ any person who was an employee of Company until six (6) months after such individual's employment relationship with Company has been terminated.

(Doc. No. 153-37) (emphasis added). The Non-Competition Agreement defines the term "the Business" as follows:  "'Business'—means the sale of commercial wire."  (*Id*. at PageID# 6687.)  In addition, it provides that the "Non-Competition Period" is five years from the execution of the agreement.  (*Id*.)  Lastly, the Non-Competition contains an integration clause, providing that "[t]his Agreement . . . contains the entire understanding between the parties with respect to the subject matter hereof and other agreements or understandings, oral or written, between the parties hereto with respect to the subject matter hereof."  (*Id*. at PageID# 6690.)

At some point thereafter, Stein formed Defendant PPM in Florida.  (Stein Depo. at Tr. 19-20.)  On January 31, 2017, Defendant PPM and Boykin Manufacturing executed an Asset Purchase Agreement for the purchase and sale of the assets of Boykin Manufacturing d/b/a/ Plastics & Products

10

Marketing.  (Doc. No. 153-40.)  Stein testified that Defendant PPM sells a wide variety of plastic products, including through its Amazon online store.  (Stein Depo. at Tr. 25-26, 63.)  It does not, however, sell any wire products.  (*Id*. at Tr.  51-53.)

Plaintiffs subsequently became aware that Stein was operating Defendant PPM and ceased making monthly installment payments under the June 2016 Settlement and Non-Competition Agreements after January 2018.  (Stein Aff. (Doc. No. 152-2) at ¶ 3.)  In April 2018, Defendants sold a plastic condiment organizer directly to Plaintiff Williams at the address for AWF, Industries, and Holdings.  (Stein Depo. at Tr. 97-100; Doc. No. 153-41.)  In October 2018, Plaintiffs discovered that Defendants sold a different plastic condiment organizer to an individual in Cleveland, within a 30-mile radius of Plaintiffs' property.  (Stein Depo. at Tr. 38-41; Doc. No. 153-42.)  Stein acknowledged in deposition that AWF also manufactured this particular plastic product.  (Stein Depo. at Tr. 38-41.)

Plaintiffs filed the instant lawsuit in February 2018.  (Doc. No. 1-1.)  Plaintiffs claim (and Defendants do not dispute) that, at some point thereafter, Defendant Stein returned the cooler prototype that his son Michael had taken from AWF in July or August 2015.

## II.    Procedural Background

On February 23, 2018, Plaintiffs AWF, Industries, Holdings, and Williams (hereinafter referred to collectively as "Plaintiffs") filed a Complaint against Defendant Stein in the Cuyahoga County Court of Common Pleas, alleging numerous state-law claims arising out the alleged breach of the parties' Settlement and Non-Competition Agreements.  (Doc. No. 1-1.)  Defendant Stein removed the action to this Court on March 29, 2018 on the basis of complete diversity of citizenship. (Doc. No. 1.)

11

A flurry of motions followed. On April 5, 2018, Defendant Stein filed Motions to Dismiss, and to Seal. (Doc. Nos. 3, 4.) Plaintiffs filed a Motion to Enforce Forum Selection Clause and for Remand, which Defendant opposed. (Doc. Nos. 6, 7, 9.) On October 18, 2018, then-assigned District Judge Christopher Boyko denied Plaintiffs' Motion to Enforce Forum Selection Clause and for Remand. (Doc. No. 14.) Judge Boyko granted, in part, Defendant's Motion to Seal,[7] and granted Defendant's Motion for Pretrial Conference. (Doc. Nos. 15, Non-Document Order dated Oct. 3, 2018.) Judge Boyko conducted a conference on November 8, 2018, at which time various case management deadlines were set. (Non-Document Order dated Nov. 8, 2018.)

Meanwhile, Plaintiffs filed an Amended Complaint on November 20, 2018, in which it added PPM as a Defendant. (Doc. No. 19.) Therein, Plaintiffs asserted claims for (1) Breach of Contract/Breach of Implied Covenant of Good Faith (Count I); (2) Misappropriation of Trade Secrets under Ohio Rev. Code 1333.61 *et seq.* (Count II); (3) Tortious Interference (Count III); (4) Fraud (Count IV); (5) Breach of the Duties of Loyalty, Care, and Good-Faith and Fair Dealing (Count V); (6) Conversion (Count VI); and (7) Accounting (Count VII). (*Id.*) Plaintiffs sought the following relief: (1) compensatory damages; (2) rescission of the parties' Settlement Agreement and Non-Compete Agreement; (3) injunctive relief restraining Defendants from using, disclosing, or benefiting in any way concerning Plaintiffs' trade secrets and/or confidential information; (4) punitive damages; (5) pre and post-judgment interest; and (6) costs. (*Id.* at pp. 30-31.)

---

[7] With regard to the Motion to Seal, Judge Boyko found as follows: "Balancing the federal court's interest in open and public judicial proceedings with the parties' desire to keep certain contractual terms confidential, the Court orders Plaintiffs to file a revised copy of the Settlement Agreement . . . , redacting the monetary consideration to be paid to Defendant under the Settlement Agreement." (Doc. No. 15.)

Defendants filed an Answer and Counterclaim on December 4, 2018.  (Doc. No. 20.)  After obtaining leave, Defendants thereafter filed an Amended Answer and Counterclaim.  (Doc. Nos. 79, 82.)  Therein, Defendants asserted one counterclaim, for breach of the payment provisions of the parties' Settlement Agreement.  (*Id.* at pp. 20-21.)  A Stipulated Protective Order was entered on January 15, 2019.  (Doc. No. 25.)

During discovery, Plaintiffs sought to obtain information regarding statements made during the private mediation that resulted in the parties' Settlement Agreement.  Specifically, in April 2019, Plaintiffs issued subpoenas to depose the mediator (former Judge Burt Griffin) and Defendant Stein's former counsel, Mr. Crystal.  (Doc. Nos. 31-2; 33-2.)  Defendants filed Motions to Quash both subpoenas (Doc. Nos. 32, 33), and Mr. Crystal filed a Motion to Quash Subpoena on May 3, 2019.  (Doc. No. 31.)  Shortly thereafter, Plaintiffs filed two Motions for *In Camera* Hearing pursuant to Ohio Rev. Code § 2710.05(B)(2).  (Doc. Nos. 36, 41.) The following month, Plaintiffs filed Motions to Compel the testimony of Mr. Crystal and Defendant Stein.  (Doc. Nos. 47, 48.)  Each side opposed the other's various Motions.

This matter was re-assigned to the undersigned on June 27, 2019 pursuant to General Order 2019-13.  On October 16, 2019, the Court issued a Memorandum Opinion & Order in which it rejected Plaintiffs' efforts to obtain discovery regarding statements made during mediation.  (Doc. No. 147.)  Specifically, the Court determined that "any testimony from Mr. Griffin, Mr. Crystal, or Defendant Stein regarding statements made during the March 2016 private mediation is barred by Ohio's mediation privilege."  (*Id.* at p. 11.)  In addition, the Court denied Plaintiffs' request for a hearing on the grounds that "Plaintiffs could obtain evidence regarding Stein's allegedly fraudulent

13

statements made prior to the mediation through other means, including through the testimony of representatives of Plaintiffs to whom Stein made his alleged misrepresentations."  (*Id.* at p. 9.)

On January 31, 2020, Defendants filed a Motion for Summary Judgment on Plaintiffs' Complaint (Doc. No. 151) and Motion for Summary Judgment on Counterclaim (Doc. No. 152.)  On that same date, Plaintiffs filed a combined Motion for Summary Judgment on the Counterclaim and Motion for Partial Summary Judgment as to the Complaint.   (Doc. No. 153.)  Briefs in Opposition were filed on March 2, 2020, and Replies were filed on March 16, 2020.[8]  (Doc. Nos. 155, 156, 157, 158, 159, 160.)

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty*

---

[8] The parties filed all of their summary judgment briefing and exhibits under seal, apparently based on the Stipulated Protective Order entered on January 15, 2019.  The parties, however, did not comply with the terms of the Stipulated Protective Order.  Under that Order, the parties should have filed both public and non-public versions of their briefs. (Doc. No. 25 at ¶ 7c.)  The public version should have contained redactions of all material designated as "confidential information" pursuant to the Stipulated Protective Order.  (*Id.*)  The non-public version (with no redactions) should have been filed under seal, with a hard copy delivered to Chambers. (*Id.*)  Here, both parties filed their entire briefs and all of their exhibits under seal but failed to also file redacted versions for the public docket. Via a separate Order issued this date, the parties have been ordered to file public versions of the instant summary judgment briefing, in accordance with Paragraph 7c of the Stipulated Protective Order.

*Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV. Analysis

### A. Breach of Contract (Count I)

In Count I of the Amended Complaint, Plaintiffs allege that Defendant Stein breached numerous provisions of the parties' Settlement and Non-Competition Agreements. (Doc. No. 19 at

¶¶ 79(a) – (k).)   Specifically, Plaintiffs allege that Stein breached the parties' Agreements when he (1) misappropriated, used, or disclosed Plaintiffs' proprietary and/or confidential information; (2) failed to use his best efforts to return the cooler prototype; (3) defamed Plaintiffs to Plaintiffs' customers; (4) owned and operated Defendant PPM so as to compete with Plaintiffs within a 30 mile radius of Plaintiffs' property; (5) engaged in practices for the purpose of evading the provisions of the covenants not to compete; and (6) induced, or attempted to induce, one or more suppliers, contractors, or customers of Plaintiffs to terminate or adversely change its relationship with Plaintiffs. (*Id.*)

In their Motion for Summary Judgment, Defendants move for judgment with respect to Plaintiffs' claim that Stein violated his covenant not to compete, as set forth in Section 3.2(a) of the June 2016 Non-Competition Agreement. (Doc. No. 151 at pp. 9-11.)  Defendants do not move for summary judgment with respect to any of the other specific breach of contract sub-claims set forth in Count I of the Amended Complaint.

Plaintiffs move for summary judgment in their favor with respect to several (but not all) of their breach of contract sub-claims.  (Doc. No. 153.)  Specifically, Plaintiffs move for judgment with respect to their claims that Stein violated (1) the covenant not to compete provisions of the parties' Agreements, including Section 3.2(a) of the June 2016 Non-Competition Agreement; (2) the confidentiality and trade secret provisions set forth in Section 10 of the June 2016 Settlement Agreement and Section 2.3 of the June 2016 Non-Competition Agreement; and (3) the requirement

that Stein use his best efforts to return the cooler prototype, as set forth in Section 15 of the June 2016 Settlement Agreement.[9]  (*Id.*)

The Court will address each of Plaintiffs' breach of contract sub-claims separately, below.

### 1.     Section 3.2(a) of the Non-Competition Agreement

Plaintiffs allege that Defendant Stein breached the June 2016 Non-Competition Agreement when he purchased Defendant PPM and sold competing products to customers in Cleveland.  (Doc. No. 19 at ¶ 79.)  As noted above, Plaintiffs and Defendants each move for summary judgment in their favor with respect to this claim.  (Doc. Nos. 151, 153.)

Section 3.2(a) of the parties' June 2016 Non-Competition Agreement provides that, for a period of five years, Stein will not "directly or indirectly . . .  (i) operate, control, advise, be engaged by, perform any consulting services for, invest in or otherwise become associated with in any capacity, any business, company, …, or other entity, who or which . . . conducts **the Business** in any manner within a thirty (30) mile radius of either the real property located at 3636 West 58th Street, Cleveland, Ohio or (ii) engage in any practice the purpose of which is to evade the provisions of this contract." (Doc. No. 153-37 at § 3.2(a)) (emphasis added).  The Non-Competition Agreement defines the term "Business" as "the sale of commercial wire."  (*Id.* at § 1.)

 In their respective summary judgment motions, both parties argue that the term "the sale of commercial wire" is clear and unambiguous.  Each, however, offers a vastly different interpretation as to its meaning.  Defendants argue that, on its face, this term clearly applies only to the sale of commercial wire products. (Doc. No. 151 at p. 9.)  Defendants assert that this term is unambiguous

---

[9] Neither party expressly moves for judgment in their favor with respect to any of the other breach of contract sub-claims set forth in the Amended Complaint.

and, by its very terms, does not include the sale of plastic products.  (Doc. No. 160 at p. 5.)  Because Defendant PPM only sells fabricated plastic products (and not commercial wire products), Defendants maintain that Stein has not violated the terms of the Non-Competition Agreement.  (Doc. No. 151 at p. 10.)

Plaintiffs, on the other hand, assert that the term "sale of commercial wire" clearly and unambiguously refers to the business of AWF, which includes the sale of both wire and plastic products.  (Doc. No. 159 at p. 1, 6-8.)  They maintain that, "[b]y noting that the 'Business' of the Company was commercial wire, . . . it is reasonable to conclude that the parties were aware that the term 'Commercial Wire' also included plastics, wire forming, and anything else generally performed at [AWF] while Stein was operating same."  (Doc. No. 153 at p. 18.)  Plaintiffs assert that this construction is the only reasonable construction given that Stein was the partner in charge of AWF and, therefore, knew "that the business of commercial wire sales both at Wire and within the industry, includes the sale of plastic products and components."  (Doc. No. 159 at p. 2.)  In this regard, Plaintiffs note that Stein has acknowledged that, when he was at AWF, AWF manufactured plastic products and, further, that many of AWF's wire products had plastic components.  (Doc. No. 153 at p. 18.)  Plaintiffs also note that Stein admitted in deposition that PPM is currently selling the same plastic products sold by AWF when he was with AWF, and that it is doing so within the prohibited 30 mile radius.  (Doc. No. 159 at p. 2.)

Plaintiffs further assert that Defendants' narrow construction of the term "sale of commercial wire" does not make sense because AWF does not sell "commercial wire;" i.e., it does not sell coils of commercial wire to any customers.  (Doc. No. 159 at p. 1; Doc. No. 158 at p. 4.)  Thus, Plaintiffs maintain that Defendants' construction is not reasonable because it would not actually limit

18

competition between the parties in any manner and would "negate the clear purpose and intent of the agreement."  (Doc. No. 159 at p. 1.)  Citing the deposition testimony of Mr. Monroe, Plaintiffs argue that "the business of the sale of commercial wire is a term that is commonly understood within the company while Stein worked there and thus has a unique or specialized meaning."  (Doc. No. 158 at p. 6.)  Plaintiffs argue that, "[a]t best, the term is ambiguous . . . and a material question of fact exists as to what activities fall under the business of selling commercial wire."  (*Id.*)

In reply, Defendants insist that the Non-Competition Agreement is unambiguous.  (Doc. No. 156 at p. 12.)  Defendants maintain that "by limiting the definition of the 'Business' to simply the sale of commercial wire, Plaintiffs (who drafted this definition) necessarily excluded from the definition the sale of anything else, including plastics."  (*Id.* at pp. 12-13.)  To hold otherwise, Defendants maintain, would require the court to read language into the agreement, which is not appropriate in the case of a fully integrated Agreement such as the parties' Agreement herein.  (*Id.*)  Lastly, Defendants argue that "nearly everything" Plaintiffs proffer in support of their argument is irrelevant parol evidence.  (*Id.*)  Defendants assert that, because the Non-Competition Agreement is unambiguous, fully integrated, and drafted by Plaintiffs' counsel, it cannot be contradicted by using parol evidence, as a matter of law.  (*Id.*)

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 Fed. Appx. 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp*., 678 F.3d 459, 465 (6th Cir. 2012)).  *See also Gerling & Associates, Inc. v. Odulair, LLC*, 2017 WL 2790669 at * 7 (S.D. Ohio June 28, 2017).

19

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."  *Savedoff v. Access Grp., Inc*., 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted); *see Ohio Historic al Soc'y v. Gen. Maint. & Eng'g Co*., 65 Ohio App.3d 139, 583 N.E.2d 340, 345 (Ohio App. 7th Dist. 1989).  It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement."  *Savedoff,* 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996)); *see United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr*., 129 Ohio App.3d 45, 716 N.E.2d 1201, 1208 (Ohio App. 2nd Dist. 1998). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co*, 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978).  "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123 at *2 (N.D. Ohio Sept.20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003) (citation omitted).  *See also Lager v. Miller–Gonzalez*, 120 Ohio St.3d 47, 896 N.E.2d 666, 669 (2008)("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation."); *Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir.2009).  "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity

20

must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190.  In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co*., 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (Ohio App. 7th Dist. 2002), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (Ohio App. 8th Dist. 1995). "When circumstances surrounding an agreement invest the language of the contract with a special meaning, extrinsic evidence can be considered in an effort to give effect to the parties' intention." *Martin Marietta Magnesia Specialties, LLC v. Pub. Util. Comm'n*, 129 Ohio St.3d 485, 954 N.E.2d 104, 111 (2011).

In accordance with the above principles, the Court first looks to plain language of the contract to determine the meaning of the term "the sale of commercial wire."  For the following reasons, the Court finds this term to be ambiguous.  Although AWF manufactures and sells products that are made with wire, it is undisputed that AWF does not sell "commercial wire" itself; i.e., coils of commercial wire. Since AWF does not sell "commercial wire," the Court finds that it would not be reasonable to interpret the Non-Competition Agreement literally to apply only to commercial wire itself.  *See Yellowbook, Inc. v. Bradeberry*, 708 F.3d 837, 847 (6th Cir. 2013) (stating that a contract should be "construed in the light that would sustain, rather than destroy it."); *Fultz & Thatcher v. Burrows Group Corp.*, 2006 WL 3833971 at * 2 (Ohio App. 12th Dist. Dec. 28, 2006) (noting that "parties bind themselves to the plain and ordinary language used in a contract unless those words lead to a manifest absurdity.")

The parties do not direct this Court's attention to any other language in the Agreement that further explains what the terms "Business" or "the sale of commercial wire" were meant to

encompass. Rather, both parties seek to resolve this ambiguity by inserting words into the Agreement. Defendants assert that the "sale of commercial wire" means the "sale of commercial wire *products*" (and nothing else.)[10] Plaintiffs, on the other hand, argue that the use of the term "Business" in conjunction with the term "sale of commercial wire" indicates that the Agreement was meant to apply generally to the business of AWF, which would include both wire and plastic products.

Upon careful consideration of the parties' arguments, the Court finds that the term "the sale of commercial wire" is susceptible to more than one interpretation. Thus, the Court must look to extrinsic evidence to discover the parties' intent.[11]

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952 (citing *Shifrin v. Forest City Enterprises*, 64 Ohio ST.3d 635, 597 N.E.2d 499, 501 (1992)). "Extrinsic evidence may indicate 'the circumstances which surrounded the parties at the time [the agreement] was made, the object intended to be accomplished,

---

[10] Defendants do not indicate whether their interpretation of the term "sale of commercial wire" would include only products made entirely out of wire or whether it would also include products made with both wire and plastic. Williams and Stein testified that, at the time the Settlement Agreement was executed, AWF sold products made entirely of wire; products made with both wire and plastic; and products made entirely out of plastic. (Williams Depo. (Doc. No. 135-1) at Tr. 7, 12-15, 82-84; Stein Depo. at Tr. 8, 43, 47-48.)

[11] Defendants argue that, because Plaintiffs drafted the Agreement, it should be construed against them under the doctrine of *contra proferentem*. As the Sixth Circuit has explained, the "*contra proferentem*" canon is meant primarily for cases "where the written contract is standardized and between parties of unequal bargaining power." *Yellowbook,Inc. v. Bradeberry*, 708 F.3d 837, 847 (6th Cir. 2013) (quoting *Savedoff*, 524 F.3d at 764). Here, as in *Yellowbook*, the parties' Settlement and Non-Competition Agreements were not nonnegotiable contracts of adhesion, and Plaintiffs are sophisticated businesses that were represented by counsel throughout the negotiations. Accordingly, the Court declines to apply the rule of *contra proferentem* herein. The Court also rejects Defendants' argument that Plaintiffs "have already admitted that the term 'commercial wire' . . . did not incorporate the sale of any plastic products" because Plaintiffs alleged in the First Amended Complaint that the Non-Compete "did not adequately protect Plaintiffs' business interests." (Doc. No. 160 at pp. 7-8.) The Court does not construe Plaintiffs' general allegation that the Non-Compete did not protect their interests as a judicial admission regarding the meaning of the specific term "sale of commercial wire."

and the construction which the acts of the parties show they gave to their agreement.'" *Lublinsussman Group LLP v. Lee*, 2018-Ohio-666, 107 N.E.3d 724, 728 (Ohio App. 6th Dist. 2018) (quoting *Mosier v. Parry*, 60 Ohio St. 388, 401, 54 N.E. 364 (1899)).  *See also Graham*, 667 N.E.2d at 952.   In addition, "[w]hen terms of an agreement are ambiguous, parol evidence may be used to explain the understanding of the parties at the time the agreement was entered into."  *SPG, Inc. v. First St. Dev., LLC*, 2016-Ohio-2824, 64 N.E.3d 340, 349 (Ohio App. 5th Dist. 2016).  *See also Phillimore v. Butterbaugh*, 2014 WL 5336507 at * 6 (Ohio App. 5th Dist. Oct. 17, 2016).

Here, both sides testified to having very different interpretations of the meaning of the term "sale of commercial wire."  Defendant Stein testified repeatedly that he did not believe that the Non-Competition Agreement applied to plastic products.  *See, e.g.*, Stein Depo. at Tr. 42-44.  Plaintiffs, on the other hand, testified that, at the time the Non-Competition Agreement was signed, they believed that it applied to the business of AWF as a whole, i.e., to both commercial wire and plastic products.[12] (Monroe Depo. (Doc. No. 140-1) at Tr. 68-69.)

In addition, the parties offer competing testimony regarding the circumstances that allegedly existed at the time the Agreement was signed.  Defendant Stein testified that, when he worked there, AWF primarily manufactured and sold wire (rather than plastic) products.  (Stein Depo. at Tr. 8, 91.)  He further testified that he did not recall that AWF's wire division was in financial distress at the time the Agreements were executed.  (*Id*. at Tr. 12-13.)  Plaintiffs, however, cite evidence regarding the

---

[12] For example, Plaintiffs cite the following testimony from Monroe regarding what "commercial wire" means at AWF and in the industry: "I mean that's just a generic for what we do. I mean you don't just take a piece of wire and bend it. We take the wire and we powder coat it, we weld it, we add plastic to it, we do…And the wire, as far as I'm concerned when I read that, it's in the name of the company, Advance Wire. Advance Wire Forming actually is the -- technically it's Advance Wire Forming. So to hang it on commercial wire is like, yeah, we buy commercial wire. We buy it by the coil. We also powder coat it, weld it, and, you know, there's wood involved, there's plastic involved, there is graphics involved, there is cartons involved. There's the whole process." (Monroe Depo. (Doc. No. 140-1) at Tr. 68-69.)

23

allegedly "bleak" financial condition of AWF and the hope (expressed by Defendant Stein himself) that the plastics division of AWF would generate much-needed income and financial stability for the company.  (Doc. No. 153-5 at PageID# 6565.)  Finally, Plaintiffs introduced evidence that both Williams and Monroe would never have signed the Non-Competition Agreement had they known that Defendant Stein was in the process of purchasing a plastics company.  (Monroe Depo. (Doc. No. 140-1) at Tr. 70-71; Williams Depo. (Doc. No. 135-1) at Tr. 143-145.)

Based on the above, the Court finds that there is a genuine issue of material fact regarding the meaning of the terms "Business" and "the sale of commercial wire" in the June 2016 Non-Competition Agreement.[13]  Accordingly, Plaintiffs' Motion for Summary Judgment (Doc. No. 153) with regard to this claim is denied.

Defendants' Motion for Summary Judgment (Doc. No. 151) with regard to this claim is also denied with respect to Plaintiffs Williams and AWF.  However, for the following reasons, Defendants' Motion is granted with respect to Plaintiffs Industries and Holdings.  As Defendants correctly note, Plaintiff Williams expressly testified that neither Industries nor Holdings suffered any damages as a result of the conduct of Defendant Stein.  (Williams Depo. (Doc. No. 135-1) at Tr. 50.)  Plaintiffs have not contested this testimony or otherwise come forward with any evidence that Industries or Holdings suffered damages relating to Defendant Stein's alleged breach of Section

---

[13] Plaintiffs also argue that Defendant Stein breached the noncompetition provisions set forth in the March 2016 Settlement Agreement.  (Doc. No. 153 at p. 16.)  The Court rejects this argument.  The June 2016 Settlement Agreement (which refers to and incorporates the June 2016 Non-Competition Agreement) provides that it "supersedes all prior Agreements." (Doc. No. 153-36 at ¶¶ 4, 19.)  Plaintiffs nonetheless argue that Stein breached the March 2016 Settlement Agreement when he sent a letter of intent to purchase a competing company on May 24, 2016 (prior to the June 2016 Agreement).  (Doc. No. 159 at p. 10.)  The Court finds this argument to be without merit.  Plaintiffs have not sufficiently articulated (or pointed to any evidence indicating) that this letter of intent, standing alone, constitutes a breach of the March 2016 Agreement that resulted in damages.

3.2(a) of the Non-Competition Agreement.   Accordingly, Defendants' Motion for Summary Judgment with respect to this claim is denied as to Plaintiffs Williams and AWF, and granted as to Plaintiffs Industries and Holdings.

> ### 2.  Section 10 of the Settlement Agreement and Section 2.3(a) of the Non-Competition Agreement

In Count I, Plaintiffs also allege that Defendant Stein breached the Settlement and Non-Competition Agreements by "improperly misappropriating, using and/or disclosing Plaintiffs' proprietary and confidential property, includ[ing] Plaintiffs' trade secrets, research and development, client lists, pricing and other financial information, and the cooler prototype, including but not limited to disclosing said proprietary and confidential property, includ[ing] Plaintiffs' trade secrets to Plastic & Products Marketing; using Plaintiffs' proprietary and confidential property, includ[ing] Plaintiffs' trade secrets, to produce the same or substantially similar product at less cost; and/or marketing same directly to Plaintiffs' clients at a price that was less than Plaintiffs' confidential price." (Doc. No. 19 at ¶ 79(a)).  *See also id.* at ¶¶ 79(e), (f).

Plaintiffs move for summary judgment with respect to this claim. (Doc. No. 153.) Defendants do not.

As set forth *supra*, Section 10 of the June 2016 Settlement Agreement provides as follows:

> The parties hereby agree that all proprietary property of the respective parties, including trade secrets, customer lists, customer files, pricing and sales data, supplier information, any financial information shall be kept confidential and shall not be shared with anyone not a party to this Agreement unless so ordered by a court of law.

(Doc. No. 153-36 at § 10.)  In addition, Section 2.3(a) of the Non-Competition Agreement provides that:

> 2.3 _Agreements of Stein_.  Stein covenants that during the Non-Competition Period, Stein will hold in confidence the proprietary information of Company and will not disclose it to any third party except with the specific prior written consent of Company. None of the foregoing obligations and restrictions applies to any part of the proprietary information that Stein demonstrates was or became generally available to the public other than as a result of a disclosure by Stein.

(Doc. No. 153-37 at § 2.3(a)).

Plaintiffs argue that there is no genuine issue of material fact that Stein breached the above provisions.  (Doc. No. 153 at pp. 21-22.)  Specifically, they assert that Stein admitted in deposition that he acquired proprietary information about AWF's customer lists, pricing, and design.  (_Id._) Plaintiffs claim that Stein then used this information to sell similar products to several of Plaintiff's customers, including Nestle, International Delight, and Heinz.  (_Id._)

Defendants argue that Plaintiffs are not entitled to judgment in their favor with respect to this claim because Plaintiffs  have "fail[ed] to submit any admissible summary judgment evidence that Stein shared any allegedly 'proprietary property' with 'anyone not a party to the Settlement Agreement.'" (Doc. No. 156 at p. 16.)

In response, Plaintiffs argue that Stein did, in fact, share proprietary information with someone not a party to the Settlement Agreement when he shared his knowledge of AWF's customer lists and pricing information with Defendant PPM.  (Doc. No. 159 at p. 11.)  Citing Ohio law, Plaintiffs assert that "Plastic and Products Marketing, LLC is a separate person from Stein, created by the General Assembly, and which derives its power, authority and capacity from the statutes."  (_Id._)

For the following reasons, the Court finds that Defendant Stein breached Section 10 of the June 2016 Settlement Agreement and Section 2.3(a) of the June 2016 Non-Competition Agreement. As Plaintiffs correctly note, Defendant Stein admitted in deposition that he acquired "proprietary information" while working at AWF:

Q:      What is proprietary information in your vernacular, in your understanding?

A:      Design.

Q:      Anything else?

A:      Pricing.

Q:      Anything else?

A:      Customers.

Q:      Anything else?

A:      No.

Q:      Okay. And you would agree with me that while you were an owner of AW, you developed the expertise in sales pricing, agreed?

A:      Yes.

Q:      You developed an expertise in cost of goods sold, agreed?

A:      Mmm-hmm.

Q:      You developed an expertise in marketing, agreed?

A:      Yes.

Q:      You also developed a customer list, agreed?

A:      Yes.

Q:      Okay. So you took all that knowledge and expertise that you had acquired and developed at AW and took it with you when you purchased PPM, agreed?

        MR. ROYER: Objection, go ahead and answer.

A:      Yes.

(Stein Depo. at Tr. 57-58.)

The Court also finds that Defendant Stein shared AWF's proprietary information with "anyone not a party" to those Agreements.  Under Ohio law, "a limited liability company exists under R.C. 1705.01(D)(2)(e) as a separate legal entity" from its officers.  *Kaferle v. MKT Holdings, LLC*, 2018 WL 5096084 at * 3 (Ohio App. 8th Dist. Oct. 18, 2018).  Indeed, as the Sixth Circuit has explained:

> Since the inception of the concept of corporate existence, corporations have been recognized as a separate and independent legal entity. *See Disciplinary Counsel v. Kafele*, 108 Ohio St.3d 283, 287, 843 N.E.2d 169, 173 (2006); *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.,* 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, 1085 (1993); *see also State ex rel. v. Standard Oil Co*., 49 Ohio St. 137, 177, 30 N.E. 279, 287 (1892). * * * As the concept of business entities evolved, the same distinct existence has been bestowed on limited liability partnerships, general partnerships, and limited liability companies.

*In re Breece*, 2013 WL 197399 at * 8 (6th Cir. Jan. 18, 2013) (footnotes omitted).  Here, Plaintiffs argue (and Defendants do not contest) that Defendant Stein shared AWF's proprietary information with Defendant PPM.  Because Defendant PPM is an independent legal entity and is not a party to either the June 2016 Settlement or Non-Competition Agreements, the Court finds that Plaintiffs have established that Defendant Stein breached the confidentiality provisions of those Agreements.

Plaintiffs must also, however, demonstrate that there is no genuine issue of material fact that they suffered damages as a result of Defendant Stein's breach of the confidentiality provisions of the parties' Agreements.  For the following reasons, the Court finds that Plaintiffs have failed to do so.  As an initial matter (and as discussed *supra*), Plaintiff Williams testified that neither Industries or Holdings have suffered any damages as a result of Defendant Stein's conduct.  (Williams Depo. (Doc. No. 135-1) at Tr. 50.)  Thus, Plaintiffs' Motion for Summary Judgment with respect to this claim is denied as to Plaintiffs Industries and Holdings.

28

Plaintiffs Williams and AWF appear to argue that they suffered damages as a result of Stein's conduct because Defendant PPM is currently selling substantially similar plastic products as AWF, including to several of Plaintiffs' customers.  Defendants, however, have introduced evidence that some of the plastic products currently being sold by Defendant PPM were, in fact, also sold by Boykin Manufacturing for at least three years before AWF attempted to sell plastic products in 2015. (Monroe Depo. (Doc. No. 140-1) at Tr. 89-90; Doc. Nos. 151-6, 151-7.)  In addition, Defendant Stein testified that Defendant PPM has the same customers and pricing as before he bought it.  (Stein Depo. at Tr. 61.)  He further testified that Defendant PPM sells a wide variety of plastic products that AWF does not sell.  (Stein Depo. at Tr. 63.)

In light of the above, the Court finds that there is a genuine issue of material fact regarding whether Plaintiffs Williams and AWF suffered damages as a result of Defendant Stein's breach of the confidentiality provisions of the June 2016 Settlement and Non-Competition Agreements.

Accordingly, Plaintiffs' Motion for Summary Judgment with respect to this claim is denied.

### 3.        Section 15 of the June 2016 Settlement Agreement

As set forth *supra,* Section 15 of the June 2016 Settlement Agreement provides that "Stein will use his best efforts to locate and return a cooler prototype to the parties."  (Doc. No. 153-36 at ¶ 15.)  Count I of the Amended Complaint alleges that Defendant Stein breached this provision when he "fail[ed] to use his best efforts to locate and return Plaintiffs' cooler prototype . . . by claiming to not know where it was for a substantial period of time all the while Defendant Stein was misappropriating all of the confidential and proprietary information and trade secrets from same." (Doc. No. 19 at ¶ 79(c)).

Plaintiffs move for summary judgment with respect to this claim.  (Doc. No. 153 at pp. 22-24.)  Plaintiffs assert that, in August 2015, Michel Stein came to the offices of AWF, took the cooler prototype, and gave it to Defendant Stein.  (*Id*.) Plaintiffs maintain that it is undisputed that Plaintiffs thereafter made written demands for the return of the cooler prototype in March and June 2016 but that Stein did not return it until sometime after the instant lawsuit was filed in February 2018. (*Id*.) Based on the above, Plaintiffs argue that there is no genuine issue of material fact that Stein failed to use "best efforts" to return the cooler prototype.  (*Id*.)

Plaintiffs further assert that "damages were incurred as [AWF] spent massive amounts in [research and development or "R&D"] in developing this cooler prototype and Plaintiffs have been unable to use their own prototype for their own sales or to conduct additional R&D to make improvements to same and to compete for any of the requests for the product by its customers."  (Doc. No. 159 at p. 14) (citing Monroe Depo. (Doc. No. 140-1) at Tr. 102-103.)  Finally, Plaintiffs argue that "during this almost two year period, said prototype was in the hands of a competitor who sells the same or substantially similar products to Plaintiffs, allowing the competitor to have access to, and use of, Plaintiffs' research and development at no cost to itself and the ability to use it to compete against the Plaintiffs both now and in the future."  (*Id*.)

Defendants argue that Plaintiffs are not entitled to judgment in their favor with respect to this claim because "it is undisputed that Stein returned the cooler prototype."  (Doc. No. 156 at p. 16.)  With respect to damages, Defendants further assert that "it is equally undisputed that PPM is not currently and, in fact, has never sold 'electronic coolers' similar to the now-returned cooler prototype."  (*Id*. at pp. 16-17.)  Thus, Defendants maintain that Plaintiffs cannot establish either that Stein breached Section 15 of the Agreement, or that they suffered any damages.  (*Id*.)

30

The record reflects the following.  In August 2015, Michael Stein came to the offices of AWF and asked Mr. Monroe if he could take possession of a prototype for a cooler that his father had been developing for AWF.  (M. Stein Depo. at Tr. 87.)  *See also* Monroe Aff. at ¶ 13.  When asked why he took this device, Michael explained: "My father had been tinkering with things in and out of the house for 30 plus years.  I got him something else to tinker with."  (M. Stein Depo. at Tr. 87.)  Monroe did not object to Michael taking the cooler prototype at the time.  (Monroe Depo. (Doc. No. 140-1) at Tr. 131.)

Plaintiffs introduced evidence that they subsequently made at least two demands for return of the cooler prototype.  First, on March 23, 2016, the parties entered into a "short form" Mediation Settlement Agreement in which Plaintiffs demanded that Stein attempt to locate and return the cooler prototype.  Specifically, the March 2016 Settlement Agreement provides that: "Stein will use his best efforts to locate a certain cooler prototype, but does not represent herein that it is in his possession. It he locates it, he will return it to Williams."  (Doc. No. 153-30 at ¶ 9.)  Second, as noted above, the parties' June 2016 Settlement Agreement specifically addresses the cooler prototype, providing that "Stein will use his best efforts to locate and return a cooler prototype to the parties."  (Doc. No. 153-36 at ¶ 15.)

Plaintiffs assert (and Defendants do not contest) that Defendant Stein did not return the cooler prototype until after the instant lawsuit was filed in February 2018.  (Doc. No. 159 at p. 13.)  Neither party, provides this Court with an exact date on which the cooler prototype was returned.

For the following reasons, the Court finds that there is a genuine issue of material fact regarding whether Defendant Stein breached Section 15 of the June 2016 Settlement Agreement.  It

is undisputed that the parties' Agreement does not specify a time for performance; i.e., when

Defendant Stein was required to return the cooler prototype. As one Ohio court explained:

> When a contract does not specify a time for performance and time is not of the essence,[14] the law implies that performance must take place within a reasonable time. *Oil, Chem. & Atomic Workers Internatl. Union, Loc. Union No. 3-689 v. Martin Marietta Energy Sys.* (1994), 97 Ohio App.3d 364, 369; *155 N. High Ltd. v. Cincinnati Ins. Co.* (1991), 75 Ohio App.3d 253, 258.
>
> A breach of the implied duty to perform within a reasonable time constitutes a material breach of the contract. 23 Williston, Contracts (4 Ed.2000) 487-488, Section 63:18 ("An unreasonable delay in performance constitutes a material breach.").

*Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, 2007 WL 1641155 at *3 (Ohio App. 10th Dist.

June 7, 2007) (internal citations omitted). "Reasonable time for a contract's performance is not

measured by hours, days, weeks, months or years, but is to be determined from the surrounding

conditions and circumstances which the parties contemplated at the time the contract was executed."

*Miller v. Bealer,* 80 Ohio App.3d 180, 608 N.E.2d 1133, 1135 (Ohio App. 9th Dist. 1992). In

determining whether performance was tendered within a reasonable time, the Court should consider

"any uncontrollable delays encountered during performance" and then "must gauge whether the

length of time spent performing was reasonable." *Morton Bldgs.*, 2007 WL 1641155 at *3.

"What constitutes a reasonable time for contract performance is an issue of fact determined

by the conditions and circumstances which the parties contemplated at the time the contract was

executed." *Stone Excavating, Inc. v. Newmark Homes, Inc.*, 2004 WL 1753377 at * 2 (Ohio App.

2nd Dist. Aug. 6, 2004) (citing *Miller*, 80 Ohio App.3d at 182). *See also Knighten v. Erie Islands

Resort & Marina*, 2016 WL 5788928 at * 5 (Ohio App. 6th Dist. Sept. 30, 2016); *Garofoli v. Whiskey*

---

[14] Plaintiffs herein do not argue that "time was of the essence" with respect to Section 15 of the June 2016 Agreement.

32

*Island Partners, Ltd*., 2014-Ohio-5433, 25 N.E.3d 400, 407 (Ohio App. 8th Dist. Dec. 11, 2014). "[U]sually the question as to what is a reasonable time is for the jury." *Cionni v. Reid*, 1991 WL 139579 at * 3 (Ohio App. 7th Dist. July 25, 1991) (quoting 18 Ohio Jurisprudence 3d 101, Contracts, Section 197).  *See also Shrock v. Mullet,* 2019 WL 2767002 at * 8 (Ohio App. 7th Dist. June 28, 2019) (stating that "what is a reasonable time is subject to an evaluation of the totality of the circumstances and is typically a factual question for trial").

Here, it is undisputed that Defendant Stein returned the cooler prototype at some point after the instant lawsuit was filed in February 2018.  The Court finds that the question of whether Stein used "best efforts" to return the cooler prototype and whether his performance was within a "reasonable time" are factual questions for the jury.  Accordingly, Plaintiffs' Motion for Summary Judgment with respect to this claim is denied.

### B.     Breach of the Duty of Good Faith and Fair Dealing (Count I)

In Count I of the Amended Complaint, Plaintiffs allege that Defendants breached the duty of good faith and fair dealing by (1) "intentionally and fraudulently mislead[ing] Plaintiffs as to Defendant's health and intentions as to competing against Plaintiffs to induce Plaintiffs to participate in the business mediation, to purchase his interest in the Plaintiff companies, and/or to enter into the Settlement and Non-Compete Agreements on the terms and conditions stated therein;" and (2) "knowingly acting to purchase a direct competitor of Plaintiffs and intending to directly compete against Plaintiffs while engaging in the business mediation and representing to Plaintiffs that he had no intentions of competing against Plaintiffs or working in the industry and that he was unable to continue working due to his health."  (Doc. No. 19 at ¶¶ 81, 82.)

33

Both parties move for summary judgment in their favor with respect to this claim.  (Doc. Nos. 151, 153.)  Defendants argue that they are entitled to judgment because "the fact that Defendant Stein is merely realizing the benefit of his bargain does not constitute bad faith."  (Doc. No. 151 at p. 11.)  Defendants further assert that Plaintiffs have "failed to point to any specific obligation imposed by the contract that Stein allegedly breached" and that, in fact, "the undisputed evidence establishes that Stein did perform pursuant to the exact language of the Non-Compete."  (Doc. No. 160 at p. 10.)  Plaintiffs, on the other hand, argue that there is no question of material fact that Stein is in breach of the June 2016 Settlement and Non-Competition Agreements.  (Doc. No. 159 at p. 15-16.)

The Ohio Supreme Court has summarized the law regarding the implied duty of good faith and fair dealing, as follows:

> {¶ 42} In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement. *See Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996); Restatement of the Law 2d, Contracts, Section 205 (1981); see also R.C. 1301.304. We have recognized that " ' "[g]ood faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.' " *Ed Schory & Sons* at 443–444, 662 N.E.2d 1074, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990).

> {¶ 43} As a comment in the Restatement explains, "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement, Section 205, Comment a. However, we have rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms. *Ed Schory & Sons* at 443–444, 662 N.E.2d 1074; *see also Wendy's Internatl., Inc. v. Saverin*, 337 Fed. Appx. 471, 477 (6th Cir.2009) (applying Ohio law); 23 Lord, Williston on Contracts, Section 63:22 (4th Ed.2003). Thus, **there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract,** such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance. *See Ed Schory & Sons* at 443–444, 662 N.E.2d 1074; 23 Lord, Section 63:22; Restatement, Section 205, comment e.

34

¶ 44} Courts in Ohio have therefore recognized that there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract. *E.g., Patrick v. CitiMortgage, Inc.*, 676 Fed. Appx. 573, 577 (6th Cir.2017); *Macklin v. CitiMortgage, Inc.*, 8th Dist. Cuyahoga No. 101077, 2015-Ohio-97, 2015 WL 204062, ¶ 14; *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. Franklin No. 04AP-980, 2006-Ohio-638, 2006 WL 328679, ¶ 98.

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 97 N.E.3d 458, 469-470 (2018) (emphasis added).

Here, as set forth above, the Court has determined that there are genuine issues of material fact regarding whether Defendant Stein breached Section 3.2(a) of the June 2016 Non-Competition Agreement and Sections 10 and 15 of the June 2016 Settlement Agreement. Accordingly, the Court finds that summary judgment is not appropriate, for either party, with respect to Plaintiffs' claim for Breach of the Implied Duty of Good Faith and Fair Dealing. Plaintiffs' and Defendants' Motions for Summary Judgment with respect to this claim are, therefore, denied.

## C. Misappropriation of Trade Secrets (Count II)

In Count II of the Amended Complaint, Plaintiffs assert a claim for misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61, *et seq.* (Doc. No. 19 at ¶¶ 86-107.) Therein, Plaintiffs allege that "Defendants have actually misappropriated Plaintiffs' trade secrets and have threatened to continue to do so by using Plaintiff's research and development, prototypes and knowledge as to cost and pricing, to copy and sell substantially similar products to those which Plaintiff has designed and manufactured, at a significantly reduced cost to Defendants, which is then used to undercut Plaintiff's market price." (*Id.* at ¶ 88.) In particular, the Amended Complaint alleges that Defendants misappropriated trade secrets by obtaining, retaining, and disclosing Plaintiffs' customer lists and cooler prototype. (*Id.* at ¶¶ 93-94.)

Defendants move for summary judgment in their favor with respect to this claim. (Doc. No. 151 at pp. 11-13.)  Defendants argue that "Plaintiffs are unable to produce any evidence that the Defendants have used any trade secrets, or, for that matter, that Plaintiffs even had anything that constituted a trade secret." (*Id*.)  Defendants further assert that "Plaintiffs cannot offer any evidence that they made reasonable efforts to maintain the secrecy of any trade secrets." (*Id.*)

In response, Plaintiffs argue that there are material issues of fact with respect to this claim. (Doc. No. 158 at pp. 19-21.)  Plaintiffs assert that Stein acknowledged in deposition that AWF's customer lists and pricing constituted "proprietary information" and that he took such information with him when he left AWF. (*Id*.)  In addition, Plaintiffs argue that it is undisputed that Stein took Plaintiffs' cooler prototype after he left AWF in July 2015 and did not return it until after the instant lawsuit was filed in February 2018. (*Id*.)  With regard to whether they made reasonable efforts to maintain the secrecy of their proprietary information, Plaintiffs argue that they did so by requiring Stein to execute the Settlement and Non-Competition Agreements, which expressly required him to (1) keep Plaintiffs' proprietary information confidential; and (2) return the cooler prototype. (*Id*.)  Finally, Plaintiffs argue that Stein "is currently selling the same, or substantially similar, plastics products as those developed by Plaintiff to Plaintiff's customers." (*Id.*)

In their Reply Brief, Defendants maintain that they are entitled to judgment in their favor as a matter of law because "Plaintiffs have introduced no evidence that Stein has shared any alleged proprietary property with anyone not a party to the agreement." (Doc. No. 160 at p. 23.)  Defendants further assert that Plaintiffs failed to offer any evidence to corroborate their assertion that its customer lists and pricing information are not "generally known to the public." (*Id.*)

36

In order to prevail on a misappropriation of trade secrets claim under the Ohio Uniform Trade Secrets Act ("OUTSA"), a plaintiff must prove: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret.  *See Tomaydo-Tomahdo, LLC v. Vozary*, 2017-Ohio-4292, 82 N.E.3d 1180, 1184 (Ohio App. 8th Dist. 2017).  *See also Goken America, LLC v. Bandepalya*, 2014 WL 6673830 at * 5 (S.D. Ohio Nov. 24, 2014).  The OUTSA defines a trade secret as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or **any business information or plans, financial information,** or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1)  It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2)  It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D) (emphasis added).  The Ohio Supreme Court also adopted a number of factors to analyze whether information rises to the level of trade secret:

> (1)  the extent to which the information is known outside the business;
>
> (2)  the extent to which it is known to those inside the business, i.e., by the employees;
>
> (3)  the precautions taken by the holder of the trade secret to guard the secrecy of the information;
>
> (4)  the savings effected and the value to the holder in having the information as against competitors;
>
> (5)  the amount of effort or money expended in obtaining and developing the information; and

> (6) the amount of time and expense it would take for others to acquire
> and duplicate the information.

*See State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 732 N.E.2d 373, 378 (2000).  *See also Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 414, 49 N.E.2d 1296, 1302 (2016).  Although the Ohio Supreme Court has never found one factor dispositive, it has emphasized that "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status." *Heartland Home Finance, Inc. v. Allied Home Mortgage Capital,* 258 Fed. Appx. 860, 861 (6th Cir. 2008).  Indeed, "'[o]nce material has been publicly disclosed, it loses any status it ever had as a trade secret.'" *Id.* (quoting *State ex rel. Rea v. Ohio Dept. of Educ.,* 81 Ohio St.3d 527, 692 N.E.2d 596, 601 (1998)).  Moreover, the plaintiffs bear the burden to identify and demonstrate that the information at issue is protected information under Ohio law.  *Id.*

Here, Plaintiffs argue that AWF's customer lists, pricing information, and cooler prototype constitute "trade secrets" under the OUTSA.  It is true that courts have held that customer lists, pricing information, sales and marketing strategies, and other business information can constitute "trade secrets" under the OUTSA provided the other requirements of that statute are met.  *See also Kuvedina, LLC v. Cognizant Technology Solutions*, 946 F.Supp.2d 749, 756 (S.D. Ohio 2013); *Avery Dennison Corp v. Kitsonas*, 118 F.Supp.2d 848, 854 (S.D. Ohio 2000).  Moreover, Ohio courts have found that designs and processes that contain secret information may be considered trade secrets.  *Dayton Superior v. Yan*, 2013 WL 1694838 at * 13 (S.D. Ohio Apr. 18, 2013).  *See also Levine v. Beckman*, 48 Ohio App.3d 24, 548 N.E.2d 267, 271 (Ohio App. 10th Dist. 1988) (finding that a process developed by trial-and-error over a several year period is considered a trade secret.)  Plaintiffs note

that, here, it is undisputed that Stein acquired Plaintiffs' customer lists, pricing information, and cooler prototype while at AWF, and took them with him to PPM.

Defendants argue, however, that Plaintiffs' customer lists, pricing information, and cooler prototype do not constitute "trade secrets" because Plaintiffs have failed to introduce any evidence either that (1) they took reasonable efforts to maintain the secrecy of this information, or (2) such information was not generally known to the public or readily ascertainable. "The 'secrecy' requirement in trade secret law is not a demand of absolute secrecy." *CPG Products Corp. v. Mego Corp*., 1981 WL 59413 (S.D. Ohio Jan. 12, 1981). *See also Dayton Superior*, 2013 WL 1694838 at * 13. Rather, "courts are generally concerned with whether the trade secret owner has taken reasonable measures to protect the confidential information." *Dayton Superior*, 2013 WL 1694838 at * 13. Efforts to restrict physical access to trade secrets and requiring employees to execute confidentiality agreements have been found to be reasonable steps to protect trade secrets. *See, e.g., Fred Siegel Co., LPA v. Arter & Hadden,* 85 Ohio St.3d 171, 707 N.E.2d 853, 862 (1999) (finding trade secret status justified where defendant kept client list on a password-protected computer, kept hard copies in office cabinets which were sometimes locked, and "probably" told its employees that its customer list were confidential); *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.,* 24 Ohio St.3d 41, 492 N.E.2d 814, 818 (1986) (finding trade secret status justified where employer kept plant locked, screened all visitors, and restricted access to drawings contended to be trade secrets). The protection of computerized records through password-based access restrictions has also been deemed reasonable protection. *See, e.g, The Rightthing, LLC v. Brown,* 2009 WL 249694 at *8 (N.D. Ohio Feb. 2, 2009).

Here, the Court finds that Plaintiffs have failed to come forward with evidence of reasonable efforts to maintain the secrecy of their alleged trade secrets.  Plaintiffs have not directed this Court's attention to any evidence that they undertook any measures to restrict access to either their customer lists, pricing information, or cooler prototype.  Specifically, Plaintiffs have not argued or introduced evidence that any of their alleged trade secret information was maintained on a password-protected computer or kept in a locked file cabinet, or that Plaintiffs otherwise took measures to restrict physical or electronic access to such information.  Indeed, it is undisputed that, in July or August 2015, Monroe allowed Michael Stein to take the cooler prototype from the offices of AWF, apparently without imposing any conditions or restrictions of any kind.  Moreover, Plaintiffs have not asserted that AWF had a company policy that required employees to keep AWF's trade secret information confidential. Indeed, when asked whether AWF had "any written policy instructing employees that some things were confidential and not to be shared with anyone outside the company," Williams testified that: "I don't know that."  (Williams Depo. (Doc. No. 135-1) at Tr. 68-69.)  Further, Plaintiffs have not asserted or directed this Court's attention to any evidence that AWF orally instructed its employees to keep its trade secret information confidential.

The only evidence identified by Plaintiffs in support of their assertion that they undertook reasonable efforts to maintain the secrecy of their trade secret information is that, as part of the negotiations surrounding Defendant Stein's buy-out, Plaintiffs required Stein to agree to confidentiality provisions in the parties' March and June 2016 Settlement and Non-Competition Agreements.  (Doc. No. 158 at p. 20.)  Under the circumstances presented, the Court finds this to be insufficient.  While Stein agreed to keep Plaintiffs' proprietary information confidential when he exited the companies in 2016, there is no evidence that he or any other employee of AWF were ever

asked to keep AWF's trade secret information confidential while working at AWF. Moreover, even assuming Plaintiffs undertook reasonable measures to ensure that *Stein* kept AWF's trade secret information secret after he left the company, there is no evidence that Plaintiffs also undertook efforts to ensure the secrecy of its trade secret information with respect to either AWF's other employees or the general public. For example, Plaintiffs do not allege or provide any evidence that, when Stein exited the companies, they also asked other AWF employees to sign confidentiality agreements or otherwise instituted measures (such as password protections) to restrict access to AWF's customers lists and/or pricing information.

Moreover, Plaintiffs offer no evidence regarding any of the other factors identified by the Ohio Supreme Court. Specifically, Plaintiffs do not direct this Court's attention to any evidence regarding (1) the extent to which the alleged trade secret information is known outside AWF; (2) the extent to which the alleged trade secret information is known to AWF employees; (3) the savings affected and the value to AWF in having this information as against competitors; or (4) the amount of time and expense it would take for others to acquire or duplicate the alleged trade secret information at issue.

In light of the above, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating that their customer lists, pricing information, and cooler prototype constitute "trade secrets" under Ohio Rev. Code § 1333.61(D). Defendants' Motion for Summary Judgment with respect to Plaintiffs' Misappropriation of Trade Secrets Claim (Count II) is, therefore, granted.

### D. Tortious Interference (Count III)

In Count III of the Amended Complaint, Plaintiffs allege that Defendant PPM was aware of the existence of (1) the June 2016 Settlement and Non-Competition Agreements between Plaintiffs

41

and Stein, and (2) Plaintiffs' customer relationships and contracts.  (Doc. No. 19 at ¶¶ 110, 111.)
Plaintiffs allege that Defendant PPM tortiously interfered with the same by (1) using Plaintiffs'
proprietary and confidential information to unfairly compete against Plaintiffs;  (2) using Plaintiffs'
cooler prototype to develop a product of its own that was substantially similar if not exactly the same;
(3) using Plaintiffs' supplier, cost, and pricing proprietary information to undercut Plaintiffs' prices
in the market; (4) using Plaintiffs' confidential and proprietary research and development to create
the same or substantially similar products without the development costs so as to unfairly compete
against Plaintiffs; and/or (5) using Plaintiffs' customer lists to steal customers and/or to otherwise
encourage Plaintiffs' customers to not do business with Plaintiffs.  (*Id*. at ¶ 112.)

Defendants argue that they are entitled to summary judgment with respect to this claim
because "Plaintiffs have offered no evidence that Defendants have tortiously interfered with any of
Plaintiffs' contracts." (Doc. No. 151 at pp. 13.)  Specifically, Defendants assert that PPM does not
sell to any of Plaintiffs' customers and, further, that Plaintiffs "cannot identify one supplier that
Defendants have induced to stop selling to Plaintiffs."  (*Id*.)  Lastly, Defendants argue that Plaintiffs
have no evidence that Defendants were "undercutting" Plaintiffs by selling the same product at a
lower price.  (*Id*.)

In response, Plaintiffs point to evidence that Defendants are currently selling to several of
Plaintiffs' customers, including International Delight, Nestle, Heinz, United Dairy Farmers, and/or
White Wave.  (Doc. No. 158 at p. 24.)  Plaintiffs also argue that "PPM tortiously interfered with the
contracts between Stein and Plaintiffs."  (Doc. No. 158 at p. 24.)  Specifically, Plaintiffs allege that
PPM intentionally procured the breach of the June 2016 Settlement and Non-Competition
Agreements by "allowing Stein to retain the cooler protype, use his knowledge and expertise to

directly compete against Plaintiffs in violation of the Noncompetition Agreement; and by allowing sales of the same or substantially similar products to that which are marketed and sold by Plaintiffs, without attempting to place any safeguards in place to try to avoid violations of the agreements." (*Id*.)

In their Reply Brief, Defendants argue that Plaintiffs' tortious interference claim with respect to Plaintiffs' customers fails because "Plaintiffs proffer no evidence that (1) they even had a contractual or business relationship with those companies; and (2) Stein and/or PPM intentionally procured the contracts' breach." (Doc. No. 160 at pp. 23-24.) With regard to Plaintiffs' claim that PPM interfered with the June 2016 Settlement and Non-Competition Agreements, Defendants argue that this claim fails because Stein did not breach those Agreements. (*Id*. at p. 24.)

In order to prove a claim of tortious interference with contract under Ohio law, a plaintiff must show "'(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'" *Georgia-Pacific Consumer Products LP v. Four-U-Packaging, Inc*., 701 F.3d 1093, 1102 (6th Cir. 2012) (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, 942 (S.D. Ohio 2012)).

The Court finds that Defendants are entitled to summary judgment in their favor to the extent that this claim is based on Defendant PPM's alleged tortious interference with Plaintiffs' customer contracts and relationships. Even assuming that PPM is currently selling the same or substantially similar products to some of Plaintiffs' customers, the mere fact that PPM is doing so is not, in and of itself, sufficient to show that PPM intentionally procured a breach of Plaintiffs' contractual relationships. Notably, Plaintiffs have introduced no evidence that PPM is selling the same products

43

as AWF at a lower cost, or that AWF has otherwise lost business with any of the identified customers as a result of PPM's intentional conduct.  Accordingly, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact with respect to their claim that PPM tortuously interfered with Plaintiffs' customer contracts or relationships.

However, the Court further finds that there is a genuine issue of material fact regarding whether Defendant PPM tortuously interfered with the June 2016 Settlement and Non-Competition Agreements between Plaintiffs and Defendant Stein.  Plaintiffs argue (and Defendants do not contest) that Defendant PPM was aware of the existence and terms of June 2016 Settlement and Non-Competition Agreement.  Moreover, as set forth above length above, the Court has determined that there are genuine issues of material fact regarding whether Defendant Stein breached Section 3.2(a) of the June 2016 Non-Competition Agreement and Sections 10 and 15 of the June 2016 Settlement Agreement.  Accordingly, the Court finds that Defendants have failed to demonstrate that they are entitled to summary judgment in their favor with respect to Plaintiffs' tortious interference claim to the extent it is based on Defendant PPM's alleged interference with the June 2016 Settlement and Non-Competition Agreements.

### E.  Fraud in the Inducement Claim (Count IV)

In Count IV of the Amended Complaint, Plaintiffs allege that "Defendant Stein knowingly and intentionally made material misrepresentations to Plaintiffs that (1) he had a nervous breakdown; (2) he was unable to continue working due to his health; (3) he had no intention to compete with Plaintiffs; (4) he would never compete with Plaintiffs as that was something he would never do; (5) that he had no intention of working and no ability to do so due to his health; and (6) he wanted to be bought out of the companies because of his failing health."  (Doc. No. 19 at ¶ 116.)  Plaintiffs allege

that they justifiably relied on these misrepresentations "in agreeing to purchase [Stein's] interest in the companies, in entering the Settlement agreement and Non-Compete agreement, in allowing Defendant access to confidential and proprietary materials and in not demanding more restrictive covenants for the Non-Compete." (*Id.* at ¶ 121.) Plaintiffs seek to have "the Settlement Agreement and Non-Compete Agreement declared null and void, the sale of Defendants' interests in the companies rescinded, the debts of Defendant Stein to and on behalf of the Company reinstated, and all money paid out as to said Agreements returned to the Plaintiffs as if the transaction never occurred." (*Id.* at ¶ 126.)

Defendants argue that they are entitled to summary judgment in their favor with respect to this claim for several reasons. (Doc. No. 151 at pp. 14-20.) Defendants first assert that Plaintiffs' fraud claim fails because Plaintiffs failed to tender back the consideration they received for the release contained in the June 2016 Settlement Agreement, as required by Ohio law. (*Id.*) Defendants next argue that Plaintiffs can offer no evidence that Stein ever specifically informed them that he never intended to work again. (*Id.*) Even assuming Stein made such alleged misrepresentations, Defendants maintain that it was unreasonable as a matter of law for Plaintiffs to rely on them because Stein's alleged misrepresentations directly contradict both the March and June 2016 Settlement Agreements. (*Id.*) Finally, Defendants argue that Plaintiffs have not shown that, at the time Stein made the alleged misrepresentations, he did so without present intent to perform. (*Id.*) *See also* Doc. No. 160 at pp. 10-20.)

Plaintiffs argue that material questions of fact exist as to whether Stein fraudulently induced Plaintiffs to enter into the Settlement Agreement. (Doc. No. 158 at pp. 11-18.) They maintain that the "tender back" rule does not apply because "the only consideration received by Plaintiffs was a

mutual release and non-competition agreement," which cannot be "tendered" back by anything other than rescission. (*Id.*)  Plaintiffs next assert that they have come forward with ample evidence of Stein's alleged misrepresentations, including statements made by Stein himself in June and July 2015; statements made by Michael Stein in July and August 2015; and statements made by Stein's counsel, Mr. Crystal, in November 2015. (*Id.*)  Finally, Plaintiffs assert that they were justified in their reliance on Stein's alleged misrepresentations because there are no provisions in the Settlement or Non-Compete Agreements that contradict "the fraudulent representations made by Stein that he was retiring, that retirement was necessary due to his health and that he could no longer work due to his health." (*Id.* at p. 16.)

As it is dispositive, the Court will first address Defendants' argument that summary judgment is proper because Plaintiffs failed to tender back the consideration they received for the release.

Under Ohio law, "[a] release of a cause of action is ordinarily an absolute bar to a later action on any claim encompassed within the release." *Haller v Borror Corp.*, 50 Ohio St.3d 10, 552 N.E.2d 207, 210 (1990). *See also Sheffield Metals Cleveland LLC v Kevwitch*, 2017 WL 5256832 at * 5 (N.D. Ohio Nov. 13, 2017); *Weisman v. Blauschild*, 2008 WL 192139 at * 3 (Ohio App. 8th Dist. Jan. 24, 2008).  Here, in the June 2016 Settlement Agreement, Plaintiffs agreed to "release and discharge Stein from any and all debts, obligations, claims, demands, causes of action of whatsoever kind or nature, legal or equitable arising out Stein's ownership and employment with [AWF], Industries, and Holdings, including those known or arising in the future." (Doc. No. 153-36 at ¶ 5.) Defendants assert (and Plaintiffs do not contest) that Plaintiffs' fraud in the inducement claim falls within the scope of this release.

46

To avoid this release, Ohio law requires that Plaintiffs, as the releasors, "must allege that the release was obtained by fraud and that [they have] tendered back the consideration received for the release." *Weisman*, 2008 WL 192139 at * 4.  Indeed, in a long line of cases, the Ohio Supreme Court has held that "a releasor may not attack the validity of a release for fraud in the inducement unless he *first tenders back the consideration* he received for making the release."[15] *Berry v. Javitch, Block & Rathbone, LLP*, 127 Ohio St.3d 480, 940 N.E.2d 1265, 1270 (2010) (emphasis added).  *See Haller*, 552 N.E.2d at 210 ("A release of liability procured through fraud in the inducement is voidable only, and can be contested only, after a return or tender of consideration."); *Shallenberger v. Motorists Mut. Ins. Co.*, 167 Ohio St. 494, 150 N.E.2d 295, 302 (1958); *Picklesimer v. Baltimore & Ohio R.R. Co.*, 151 Ohio St. 1, 84 N.E.2d 214, 217 (1949).  *See also Talmer Bank and Trust v. Malek*, 651 Fed. Appx. 438, 442-443 (6th Cir. 2016).

The policy behind the tender-back rule is that the law favors the prevention of litigation by the compromise and settlement of controversies. *See Haller,* 552 N.E.2d at 211; *Weisman*, 2008 WL 192139 at * 4.  Therefore, "a releasor ought not be allowed to retain the benefit of his act of compromise and at the same time attack its validity when he understood the nature and consequence of his act, regardless of the basic nature of the inducement employed."  *Haller,* 552 N.E.2d at 211.  "In that event, the consideration should *first* be returned so that the parties may be placed in the positions they enjoyed prior to the practice of the fraud alleged." *Id*. (emphasis added).

---

[15] A tender of consideration is not required, however, where the plaintiff alleges "fraud in the factum." *Haller,* 552 N.E.2d at 210. "A release is obtained by fraud in the factum"—as opposed to fraud in the inducement—"when the actions or representations of the releasee so impair the mind and judgment of the releasor that he fails to understand the nature or consequence of his release, there has been no meeting of the minds." *Id*. Here, Plaintiffs do not allege that they failed to understand the nature or consequence of the release at issue. Rather, Plaintiffs clearly allege fraud in the inducement, asserting that certain alleged misrepresentations induced the execution of the Release.  Thus, the tender back requirement applies.

"Tender, in this context, refers to an offer, not a completed transaction." *Yoskey v. Eric Petroleum Corp.*, 2014 WL 4291629 at *5 (Ohio App. 7th Dist. Aug. 29, 2014) (collecting cases). *See also Talmer Bank and Trust*, 651 Fed. Appx. at 442-443.  Moreover, as the Sixth Circuit has explained, it is well-settled that the tender must be made before the rescinding party files the lawsuit. *See, e.g., Talmer Bank and Trust*, 651 Fed. Appx. at 443; *Sheffield,* 2017 WL 5256832 at * 5; *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 614 N.E.2d 765, 770 (Ohio App. 10th Dist. 1992) ("Since plaintiff failed to tender back the consideration for the release prior to suit in this case, he is precluded from rescinding it."); *Weisman,* 2008 WL 192139 at *8 ("Since [the appellants] signed the release in exchange for consideration encompassing a ... [s]ettlement [a]greement, they only had one option. They first had to rescind and tender back the consideration—before they could bring their suit.").

Defendants maintain that, under this authority, Plaintiffs were required to tender back the consideration they received for the release before filing the instant lawsuit.  (Doc. No. 151 at p. 15; Doc. No. 160 at p. 12.)  Defendants assert that Plaintiffs failed to do so and, therefore, Plaintiffs' fraud in the inducement claim fails as a matter of law.  (*Id.*)  In response, Plaintiffs assert that the tender back requirement does not apply to them because the only consideration they received was the mutual release and non-competition agreement, which they maintain cannot be tendered back. (Doc No. 158 at pp. 10-11.)  Plaintiffs explain as follows:

> Plaintiff has not received any money to tender back as Plaintiffs were the party who paid the consideration. In fact, Plaintiffs have not received any benefit, let alone one that they can return as the only consideration received was a noncompete provision, which has been repeatedly violated by Stein, and a mutual release. Plaintiffs are seeking to have both the release and the noncompetition provisions rescinded as part of its claim for fraud in the inducement, which is the only way such provisions can be "returned." If the contract is rescinded, all parties would be placed back into the same position as if no such contract existed.

48

(*Id*. at p. 12.)

The Court finds Plaintiffs' argument to be without merit for several reasons.  First, as Defendants correctly note, Ohio courts do not narrowly define the term "consideration" to only mean money.  Rather, the Ohio Supreme Court has defined the term consideration more broadly, as follows:

> Consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Irwin v. Lombard Univ*. (1897), 56 Ohio St. 9, 19, 46 N.E. 63. A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee. *Id*. at 20, 46 N.E. 63. *See, also, Brads v. First Baptist Church* (1993), 89 Ohio App.3d 328, 336, 624 N.E.2d 737; *Nilavar v. Osborn* (1998), 127 Ohio App.3d 1, 15, 711 N.E.2d 726; *Mooney v. Green* (1982), 4 Ohio App.3d 175, 177, 4 OBR 276, 446 N.E.2d 1135.

*Lake Land Employment Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 804 N.E.2d 27, 32 (2004).  Or, as another Ohio court explained, "'[c]onsideration' is a promisor's promise to give something of value to the promisee in exchange for the promisee's promise to give something of value to the promisor." *Parker v. Smith*, 2019 WL 5457933 at * 3 (Ohio App. 8th Dist. Oct. 24, 2019).

Here, although Plaintiffs did not receive any monetary payments as consideration for their release of all claims against Stein, they did obtain all of Stein's shares/"units" in AWF, Industries, and Holdings.  (Doc. No. 153-36 at ¶ 1.)  In addition, as Plaintiffs themselves admit, they also received Stein's release of all claims against Plaintiffs, and his agreement to the provisions of the Non-Competition Agreement.  (Doc. No. 153-36 at ¶ 7; Doc. No. 153-37.)  The Court finds that the acquisition of Stein's shares/units, release, and non-competition agreement provide benefits to Plaintiffs (i.e., "something of value") and, therefore, are sufficient to constitute "consideration" under Ohio law.  Moreover, Plaintiffs have not directed this Court's attention to any evidence demonstrating

49

that, prior to filing suit, they returned (or offered to return) to Stein either his shares/units in AWF, Industries, and Holdings; his release; or his non-competition agreement.

Plaintiffs nonetheless argue (summarily) that they satisfied the tender back requirement by including a request for rescission in the Complaint.  The Court rejects this argument.  The Sixth Circuit, applying Ohio law, has made clear that consideration must be tendered back *prior to* bringing claims challenging a release:

> Under Ohio law, "a releasor"—like Malek here— "may not attack the validity of a release for fraud in the inducement unless he *first tenders back the consideration* he received for making the release." [fn omitted] *Berry v. Javitch, Block & Rathbone, LLP*, 127 Ohio St.3d 480, 940 N.E.2d 1265, 1270 (2010) (emphasis added) . . . **The tender must be made before the rescinding party files the lawsuit**. *See, e.g., Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 614 N.E.2d 765, 770 (Ohio Ct.App. 1992) ("Since plaintiff failed to tender back the consideration for the release prior to suit in this case, he is precluded from rescinding it."); *see also Weisman v. Blaushild*, No. 8815, 2008 WL 192139, at *8 (Ohio Ct. App. Jan. 24, 2008) ("Since [the appellants] signed the release in exchange for consideration encompassing a ... [s]ettlement [a]greement, they only had one option. They first had to rescind and tender back the consideration—before they could bring their suit.").[fn omitted].
>
> ***
>
> It is well-settled that under Ohio law Malek had to "*first* ... tender back the consideration—*before* [he] could bring [his] suit." *See Weisman*, 2008 WL 192139, at *8 (first emphasis added) (emphasis omitted).

*Talmer Bank and Trust*, 651 Fed. Appx. at 443-444.  *See also Sheffield Metals Cleveland, LLC*, 2017 WL 5256832 at * 5 (same).

Thus, to satisfy this requirement, Plaintiffs would have had to allege in the Complaint that they had returned, or offered to return, Stein's shares/units in AWF, Industries, and Holdings (as well as the release and non-competition agreement) prior to filing suit.  As in *Talmer Bank and Trust*,

50

Plaintiffs herein "simply failed to do so, and absent an express exception under Ohio law to the contrary, [they are] stuck with this failure."[16] *Talmer Bank and Trust*, 651 Fed. Appx. at 444.

Accordingly, the Court finds that Defendants are entitled to summary judgment in their favor as a matter of law with respect to Plaintiffs' fraud in the inducement claim.

### F.      Breach of the Duty of Loyalty and Care (Count V)

In Count V of the Amended Complaint, Plaintiffs allege that "[i]n the event the Settlement and Non-Competition Agreements are rescinded, Plaintiffs are entitled to damages for Defendant Stein's breach of the duties of loyalty and care as well as the breach of the obligation of good faith and fair dealing."  (Doc. No. 19 at ¶¶ 129-144.)

Defendants move for summary judgment in their favor with respect to this claim.  (Doc. No. 151 at pp. 20-21.)  They maintain that, "because Plaintiffs' fraud in the inducement claim fails, the

---

[16] Plaintiffs' reliance on *Yoskey v. Epic Petroleum Corp.*, 2014 WL 4291629 (Ohio App. 7th Dist. Aug. 29, 2014) is misplaced.  In *Yoskey*, the plaintiff asserted claims for (1) fraud in the inducement-rescission; (2) fraud in the inducement-damages; and (3) fraud in the inducement-declaratory judgment.  When the defendants insisted that plaintiff was required to elect between damages and rescission, plaintiff elected to proceed on rescission and withdrew his damages claim.  Defendants then argued that rescission was improper because there was no tender back of the consideration.  Plaintiff attached "an affidavit to his response to summary judgment voicing that he was ready, willing, and able to return the consideration paid."  *Id*. at * 2.  The appellate court noted that, "[n]otably, summary judgment evidence showed that plaintiff returned the May 2012 check and was rejecting the 2013 check by refusing the certified mail delivery."  *Id*. Under these circumstances, the appellate court found that plaintiff satisfied the tender back rule because (in addition to his affidavit and return of the 2012 and 2013 checks) he had included a request for rescission in his amended complaint. As an initial matter, *Yoskey* appears to conflict with Ohio Supreme Court and the Sixth Circuit authority, both of which expressly require a plaintiff seeking rescission to *first* tender back consideration *before* filing suit.  *See Berry*, 940 N.E.2d at 1270; *Talmer*, 651 Fed. Appx. at 443-444.  Regardless, the instant case is distinguishable for several reasons.  First, Plaintiffs herein have not elected to proceed on rescission instead of damages.  Rather, Plaintiffs seek to pursue both rescission and damages, in effect attempting to both enforce the non-competition and trade secrets provisions of the June 2016 Settlement Agreement and, at the same time, rescind the release provision in that same Agreement.  *See Haller*, 552 N.E.2d at 211 ("[A] releasor ought not to be allowed to retain the benefit of his act of compromise and at the same time attack its validity when he understood the nature and consequences of his act, regardless of the nature of the inducement employed.")  Second, unlike the plaintiff in *Yoskey* who both requested rescission in the complaint and returned the consideration, Plaintiffs herein have not demonstrated that they actually returned Stein's shares/units in AWF, Industries, and Holdings. In other words, Plaintiffs seek the remedy of rescission in the Amended Complaint, but have not returned (or offered to return) the consideration they received.

51

releases in the Settlement Agreement remain effective and operate as an absolute bar to Plaintiffs' breach of fiduciary duty claim and breach of the obligation of good faith and fair dealing claim." (*Id.*) In response, Plaintiffs argue that "[b]ecause material questions of fact remain as to the fraudulent inducement claim, material facts remain as to whether or not a release exists." (Doc. No. 158 at pp. 24-25.)

Defendants' Motion for Summary Judgment with respect to Count V is granted.  As set forth above, the Court has found that Defendants are entitled to judgment in their favor with respect to Plaintiffs' fraud in the inducement claim.  Therefore, Plaintiffs' breach of the fiduciary duties of loyalty, care, good faith and fair dealing are barred by the release provision set forth in the June 2016 Settlement Agreement.

Defendants' Motion for Summary Judgment with respect to Count V is granted.

### G.  Conversion (Count VI)

In Count VI of the Amended Complaint, Plaintiffs allege a state law claim for conversion based on Defendant Stein's wrongful assertion of control or exercise of dominion over "confidential and proprietary information or other intellectual property belonging to Plaintiffs."  (Doc. No. 19 at ¶¶ 145-149.)

Defendants argue that they are entitled to summary judgment in their favor with respect to this claim because "Plaintiffs have no evidence that Defendants converted anything."  (Doc. No. 151 at pp. 22-23.)  Defendants further assert that Plaintiffs' conversion claim should be dismissed because it is "merely duplicative of their breach of contract claim."  (*Id.*)

Plaintiffs argue that Defendant Stein converted AWF's property when it took possession of the cooler prototype and then failed to timely return it despite two written demands.  (Doc. No. 158

at pp. 21-22.)  In addition, Plaintiffs maintain that their conversion claim is not duplicative of their breach of contract claim relating to the cooler prototype because "a common law duty existed separate and apart from any contractual duty to return Plaintiffs' proprietary cooler prototype."  (*Id.* at p. 23.)

In reply, Defendants argue that Plaintiffs' claim fails as a matter of law because it is undisputed that the cooler prototype has been returned.  (Doc. No. 160 at p. 20-21.)  Defendants further assert that Plaintiffs have failed to identify the source of any alleged common law duty or any legal authority that would impose a "free-standing duty on Stein's part to return the cooler prototype." (*Id.*)  Finally, Defendants argue that Plaintiffs have failed to come forward with any admissible evidence regarding actual damages resulting from the alleged conversion of the cooler prototype.  (*Id.* at pp. 21-22.)

"To prevail on a conversion claim, a plaintiff must establish '(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Academic Imaging, LLC v. Soterion Corp*., 352 Fed. Appx. 59, 67 (6th Cir. 2009) (quoting *Dream Makers v. Marshek*, 2002 WL 31839190 (Ohio App. 8th Dist. Dec. 19, 2002)).  Further, "a demand and refusal are usually required to prove the conversion of property otherwise lawfully held."  *Fenix Enterprises, Inc. v. M&M Mortg. Corp., Inc*., 624 F.Supp.2d 834, 843 (S.D. Ohio 2009).

As in all tort actions that are "factually intertwined" with a contract, "[i]n conversion actions, Ohio Courts have held, '[s]uch tort claim lies against a contracting party independent of a breach of contract claim so long as the plaintiff alleges a breach of a duty owed separately from obligations created by the contract.'" *Jean v. Stanley Works*, 2006 WL 1966644 at *5 (N.D. Ohio July 5, 2006) (quoting *DeNune v. Consol. Capital of N. Am., Inc*., 288 F.Supp.2d 844, 854 (N.D. Ohio 2003)).

53

Thus, the "wrongful act" alleged must be wrongful for reasons other than breach of a contract. *Academic Imaging, LLC v. Soterion* Corp., 352 Fed. Appx. at 67.

Moreover, Ohio law requires that "[i]n addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract." *Textron Fin. Corp. v. Nationwide Mu. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261, 1271 (Ohio App. 9th Dist. 1996). *See also Academic Imaging, LLC v. Soterion* Corp., 352 Fed. Appx. at 67-68; *Hilsinger Bldg. & Dev. Corp. v. Terracon Consultants, Inc.*, 2019 WL 4601774 at * 6 (S.D. Ohio Sept. 23, 2019); *Babcock & Wilcox Power Generation Grp., Inc. v. R.T. Patterson Co.*, 2015 WL 631189 at *2 (N.D. Ohio Feb. 12, 2015).

For the following reasons, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Plaintiffs' conversion claim for several reasons. First, Plaintiffs have not demonstrated that their conversion claim is distinct from their claim that Defendant Stein breached Section 15 of the June 2016 Settlement Agreement. Both claims relate specifically to Defendant Stein's acquisition and alleged failure to promptly return the cooler prototype. While Plaintiffs argue summarily that "a common law duty existed separate and apart from any contractual duty to return Plaintiff's proprietary cooler prototype," (Doc. No. 158 at p. 23), they have failed to either identify the source of any such common law duty or explain how it applies to the particular facts of this case. Second, Plaintiffs have not argued, or introduced any evidence showing, that the damages resulting from Defendant Stein's alleged conversion of the cooler prototype would be different from or, in addition to, those resulting from the corresponding breach of Section 15 of the parties' June 2016 Settlement Agreement.

54

Accordingly, Defendants are entitled to summary judgment in their favor with respect to Plaintiffs' Conversion claim.

### H.    Accounting (Count VII)

Finally, in Count VII of the Amended Complaint, Plaintiffs allege that "they have an equitable right to an accounting due to Defendant's theft and unlawful use and disclosure of Plaintiffs' confidential and proprietary information and trade secrets for his own benefit."  (Doc. No. 19 at ¶ 151.)

Defendants move for summary judgment in their favor with respect to this claim, arguing that "Plaintiffs utterly fail to demonstrate why they are entitled to the equitable remedy of an accounting." (Doc. No. 151 at pp. 22-23.)  In response, Plaintiffs assert that Defendants' Motion should be denied because Plaintiffs "can show that Defendants' accounts include missing and hidden items which were removed or otherwise not identified in the records provided in discovery."  (Doc. No. 158 at p. 25) (citing Stein Depo. at Tr. 66-67.)

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is...the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). *See also Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972); *Zehentbauer Family Land LP v. Chesapeake Exploration, LLC*, 2016 WL 3903392 at * 4 (N.D. Ohio July 19, 2016); *Executone of Columbus, Inc. v. Inter-Tel, Inc*., 2007 WL 1144866 at *4 (S.D. Ohio April 16, 2007).   As the Supreme Court has explained, in order to maintain a suit for an equitable accounting, "the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." *Dairy Queen,* 369

55

U.S. at 478 (quoting *Kirby v. Lake Shore & Michigan Southern R. Co*., 120 U.S. 130, 134 (1887)). *See also Zehentbauer Family Land LP*, 2016 WL 3903392 at * 4.

As several of Plaintiffs' claim survive summary judgment and will proceed to trial, the Court will address the issue of whether an accounting is necessary or appropriate after this matter has proceeded to trial on the merits.  Accordingly, Defendants' Motion for Summary Judgment with respect to Plaintiffs' claim for an accounting is denied at this time.

**I.      Defendants' Counterclaim**

In their Counterclaim, Defendants assert a claim of breach of contract based on Plaintiffs' failure to continue making monthly installment payments under the 2016 Settlement and Non-Competition Agreements.  (Doc. No. 82 at pp. 20-21.)  Specifically, Defendants assert that the 2016 Agreements required Plaintiffs to make consecutive monthly installment payments, but that Plaintiffs ceased to make said payments after January 2018.  (*Id.* at p. 21.)

Plaintiffs and Defendants each move for summary judgment with respect to this claim.  (Doc. Nos. 152, 153.)  Defendants argue that the payment provisions of the 2016 Settlement Agreement (and associated Promissory Note and Personal Guaranty) are clear and ambiguous and there are no genuine issues of material fact that Plaintiffs breached those provisions when they ceased making monthly payments in January 2018.  (Doc. No. 152.)  Defendants also seek attorney fees.  (*Id.*)

Plaintiffs argue that Defendants' Motion should be denied because "Stein had materially breached the Settlement Agreement on numerous occasions prior to January 2018, thereby legally excusing Plaintiffs from making any further payments."  (Doc. No. 157 at p. 19.)  For the same reason, Plaintiffs argue that they are entitled to summary judgment in their favor with respect to Defendants'

Counterclaim because Stein cannot show that Plaintiffs failed to fulfill any contractual obligation without legal excuse. (Doc. No. 153 at p. 24-25.)

As set forth at length *supra*, the Court has determined that there are genuine issues of material fact regarding whether Defendant Stein breached Section 3.2(a) of the June 2016 Non-Competition Agreement and Sections 10 and 15 of the June 2016 Settlement Agreement.  Accordingly, the Court finds that summary judgment is not appropriate, for either party, with respect to Defendants' Counterclaim. Plaintiffs' and Defendants' Motions for Summary Judgment with respect to Defendants' Counterclaim are, therefore, denied.

## V.     Conclusion

Accordingly, and for all the reasons set forth above, the Court finds as follows.

1.     Plaintiffs' Motion for Summary Judgment on the Counterclaim and Partial Summary Judgment as to their Complaint (Doc. No. 153) is DENIED.

2.     Defendants' Motion for Summary Judgment on his Counterclaim (Doc. No. 152) is DENIED.

3.     Defendants' Motion for Summary Judgment on Plaintiffs' Complaint (Doc. No. 151) is GRANTED IN PART and DENIED IN PART, as follows.  Defendants' Motion is GRANTED with respect to:

- Plaintiffs' Breach of Contract and Breach of the Implied Covenant of Good Faith claims (Count I), as to Plaintiffs Industries and Holdings only;

- Plaintiffs' Misappropriation of Trade Secrets claim (Count II);

- Plaintiffs' Tortious Interference claim (Count III), to the extent that this claim is based on Defendant PPM's alleged tortious interference with Plaintiffs' customer contracts and relationships;

- Plaintiffs' Fraud in the Inducement claim (Count IV);

57

- Plaintiffs' Breach of the Duties of Loyalty, the Duty of Care, and the Obligation of Good-Faith and Fair Dealing claim (Count V); and

- Plaintiffs' Conversion claim (VI).

Defendants' Motion is DENIED with respect to:

- Plaintiffs' Breach of Contract and Breach of the Implied Covenant of Good Faith claims (Count I), as to Plaintiffs Williams and AWF;

- Plaintiffs' Tortious Interference claim (Count III) to the extent that this claim is based on Defendant PPM's alleged interference with the June 2016 Settlement and Non-Competition Agreements;

- Plaintiffs' Accounting claim (Count VII).

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  August 25, 2020                    U. S. DISTRICT JUDGE