IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Advance Wire Forming, Inc., et al.,** | Case No. 1:18cv723 |
| Plaintiffs, | JUDGE PAMELA A. BARKER |
| -vs- | |
| **Jeffrey Stein, et al.,** | MEMORANDUM OPINION & ORDER |
| Defendants | |

This matter is before the Court upon the following Motions filed by Defendants Jeffrey Stein ("Stein") and Plastic and Products Marketing, LLC ("PPM"): (1) Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, that Defendant Stein Allegedly Sexually Harassed Lisa Taylor (Doc. No. 185); and (2) Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, of Plaintiffs' Claim that Defendant Stein Altered PPM's Inventory (Doc. No. 186.) Plaintiffs Advance Wire Forming, Inc., Advance Industries Group, LLC, AIG Holdings, LLC, and James Williams filed Briefs in Opposition on March 15, 2022. (Doc. Nos. 196, 197.)

For the following reasons, Defendants' Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, that Defendant Stein Allegedly Sexually Harassed Lisa Taylor (Doc. No. 185) is granted; however, the Court will consider allowing Plaintiffs to introduce this evidence if Defendants open the door as set forth herein. Defendants' Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, of Plaintiffs' Claim that Defendant Stein Altered PPM's Inventory (Doc. No. 186) is granted.

**I.        Relevant Background**

       **A.        Factual Background**

The Court summarizes the facts relevant to the instant Motions as follows.[1] Plaintiff Williams and Defendant Stein were formerly co-owners of Plaintiffs Advance Wire Forming, Inc. ("AWF"), Advance Industries Group, LLC ("Industries"), and AIG Holdings, LLC ("Holdings"). (Deposition of Jeffrey Stein (Doc. No. 133-1) at Tr. 5-6, 8.) In July 2015, Stein was hospitalized and treated for various mental health conditions. (Doc. No. 153-16, Doc. No. 153-18, Doc. No. 151-8.) Stein did not return to work for Plaintiffs after he was discharged from the hospital. Instead, in January 2016, Stein, through counsel, made a demand for mediation and arbitration to discuss a buy-out of his interests in AWF, Industries, and Holdings. (Williams. Aff. (Doc. No. 158-46) at ¶ 11.) The parties and their counsel engaged in formal mediation proceedings in March 2016, culminating in the execution of a "short form" agreement regarding the terms of a buy-out (hereinafter "March 2016 Mediation Agreement"). (Doc. No. 153-30.)

Between March and June 2016, the parties, through counsel, exchanged drafts of a formal Settlement Agreement. In June 2016, the parties executed a formal (1) Settlement Agreement and Mutual Release; and (2) Non-Competition Agreement. (Doc. Nos. 153-36, 153-37.) In the former, Stein agreed to assign, transfer, and sell all of his shares in AWF, Industries, and Holdings, in exchange for a monetary payment from Plaintiffs. (Doc. No. 153-36 at ¶¶ 1, 2.) In addition, the June 2016 Settlement Agreement contains mutual release provisions, as well as (among other things) a confidentiality provision, a provision requiring Stein to use his best efforts to return a certain cooler prototype, and a non-disparagement provision. (*Id*. at ¶¶ 10, 15, 19.) The June 2016 Non-Competition

---

[1] The facts underlying this action are thoroughly set forth in this Court's August 25, 2020 Memorandum Opinion & Order regarding the parties' cross Motions for Summary Judgment (Doc. No. 163) (hereinafter "Summary Judgment Order") and will not be repeated in full herein.

2

Agreement contains confidentiality, non-competition, and non-solicitation provisions. (Doc. No. 153-37.)

Plaintiffs allege that, both before and after the June 2016 Agreements were executed, Stein was actively engaged in negotiations to acquire the assets of a Florida company owned by Lynne Boykin (hereinafter referred to as "Boykin Manufacturing"). (Stein Depo. at Tr. 13, 15-16; Doc. Nos. 153-24, 153-26; Boyko Depo. (Doc. No. 129-1) at Tr. 120-121.) Lisa Taylor was employed at Boykin Manufacturing for over sixteen years, beginning in December 2000.[2] (Lisa Taylor Depo. (Doc. No. 142-1) at Tr. 6.) At some point during her employment there, she became the General Manager. (*Id*. at Tr. 7.) In this role, she was responsible for purchasing, accounting, dealing with vendors and customers, collections, production scheduling, handling health/workers compensation insurance, paying the bills, and signing the checks. (*Id*. at Tr. 72.) Of particular note, Ms. Taylor testified that she was responsible for inputting approximately 90% of the company data into QuickBooks, including data relating to purchase orders, payroll, checks, new products sales, and inventory. (*Id*. at Tr. 39-40.)

On January 31, 2017, Stein's newly formed company, Defendant PPM, and Boykin Manufacturing executed an Asset Purchase Agreement for the purchase and sale of the assets of Boykin Manufacturing (hereinafter "the 2017 Asset Purchase Agreement"). (Doc. No. 153-40.) Ms. Taylor testified that she continued to work for PPM in the same capacity as she had worked for Boykin Manufacturing, i.e., as general manager. (Taylor Depo. at Tr. 21, 24-25.) She further testified

---

[2] The Court notes that, while Plaintiffs discuss Ms. Taylor's deposition testimony extensively in their briefs in opposition (Doc. Nos. 196, 197), they fail to include any citations to Ms. Taylor's deposition transcript. Plaintiffs should by this time be well aware, and are now cautioned, that any references to deposition testimony in motions or briefs filed in this matter must be supported by specific citations to the record.

that she had the same duties and responsibilities (and, in fact, assumed additional duties) as general manager of PPM as she did when she worked as general manager of Boykin Manufacturing, including responsibility for QuickBooks. (*Id*. at Tr. 24-25, 71-72.)

It is clear from a review of Ms. Taylor's deposition that her employment relationship with Stein did not go well. Taylor testified that, in May 2017, Stein decided to give raises to all the male employees (except one) in the amount of $1 to $1.50 per hour, while only giving raises to (most of) the female employees of $0.50 per hour. (*Id*. at Tr. 80.) Stein did not, however, give any raise to Ms. Taylor, allegedly telling her that she "made a good living for a woman." (*Id*. at Tr. 80-81.) In addition, Taylor testified that her relationship with Stein was strained because, beginning "early on," he began making her feel uncomfortable by inviting her to go on a weekend getaway with him, talking about his dating life, and making inappropriate remarks about the women in the office.[3] (*Id*. at Tr. 90-91.)

Taylor also testified that, at some point around May 2017, Stein asked her to improperly alter the inventory in QuickBooks to make it look like PPM had a "very low balance." (*Id*. at Tr. 40.) She stated that "the purpose was that, when he had purchased the business [from Lynne Boykin], he had one year from the time of purchasing to say that, you know -- make any changes whether he would further owe Lynne more money, or he would not owe her any more money. And the inventory asset report [in QuickBooks] was associated to that." (*Id*.) Ms. Taylor further explained:

> Q: And you said he had one year to pay the inventory?
>
> A: No. He had one year to report if there were any discrepancies in what he thought he was purchasing to what he actually had purchased.

---

[3] For example, Taylor testified that Stein asked her "why did you only ever hire fat women?" (*Id*. at Tr. 91.)

4

> Q: Okay. And so, when he asked you -- so he asked you to basically alter it so the inventory was less than it otherwise was?
>
> A: Yes, sir.
>
> Q: Okay. Because that way he wouldn't have to pay Boykin as much for inventory?
>
> A: Right. But there could be -- my understanding was that he wouldn't have to pay any more money. What he had paid for the business would be what it -- you know, and the assets, would be what it was.
>
> Q: What was your reaction when he asked you to do that?
>
> A: Absolutely not.

(*Id.* at Tr. 41.) Taylor testified that, after she refused to alter QuickBooks, Stein instructed her to instruct the employees to throw "three dumpster loads of product" away so that it could not be counted as inventory.[4] (*Id.* at Tr. 47.)

Taylor claims that, several months later, Stein touched her inappropriately in the office. She testified as follows:

> Q: All right. So … you indicated there was an incident that occurred. What was that?
>
> A: September 14th, 2017, at approximately 12:07 p.m., . . . I went into his office. I closed the door to speak to him about my raise. I was across the desk. He came around the desk to where I was sitting. There were two chairs. They were probably at that point about 16 to 18 inches apart. He pulled the chair closer to my chair. And he took his hand and he put it on the upper top of my thigh, which - - with his thumb touching my private area, and said to me, there are other ways to get a raise. At which point, I got up and I walked out.

---

[4] When Plaintiffs' counsel asked Ms. Taylor what she believed was the purpose of having items discarded and put in the dumpster, she stated: "My belief was that, if it wasn't on the inventory asset, it would show a very low number. Because then I had to make those entries and deduct that from the inventory. I felt like that was his way around me saying that I would not do what he had asked." (*Id*. at Tr. 45.)

5

(*Id*. at Tr. 91-92.) Based on the above, and her refusal to alter QuickBooks, Taylor testified that "she knew he [Stein] was coming for me. I knew that he was coming for me. I could tell." (*Id*. at Tr. 94.)

On November 14, 2017, Taylor told Stein that "if he ever touched [her] again, if he ever said anything, that [she] was going to tell [her friend] Billy. And that wouldn't be a good day for him." (*Id*.) Taylor testified that she resigned on November 30, 2017 and has not been back on PPM's property since. (*Id*. at Tr. 100, 109-111.)

Meanwhile, Plaintiffs became aware that Stein was operating Defendant PPM and ceased making monthly installment payments under the June 2016 Settlement and Non-Competition Agreements after January 2018. (Stein Aff. (Doc. No. 152-2) at ¶ 3.) On two separate occasions in 2018, Defendants sold a plastic condiment organizer[5] to individuals in Cleveland, within a 30-mile radius of Plaintiffs' property. (Stein Depo. at Tr. 38-41, 97-100; Doc. Nos. 153-41, 153-42.) Plaintiffs allege that these sales violated the parties' June 2016 Non-Competition Agreement. Plaintiffs further allege that Stein used confidential information he obtained while working for AWF to disparage AWF to Plaintiffs' customers and solicit those customers to place orders with PPM.

### B. Procedural Background

Plaintiffs filed the instant lawsuit on February 23, 2018.[6] (Doc. No. 1-1.) In their Amended Complaint, Plaintiffs assert claims for (1) Breach of Contract/Breach of Implied Covenant of Good Faith (Count I); (2) Misappropriation of Trade Secrets under Ohio Rev. Code 1333.61 *et seq*. (Count II); (3) Tortious Interference (Count III); (4) Fraud (Count IV); (5) Breach of the Duties of Loyalty,

---

[5] Stein acknowledged in deposition that AWF also manufactured this particular product. (Stein Depo. at Tr. 38-41.)

[6] Plaintiffs originally filed the instant lawsuit against Stein in the Cuyahoga County Court of Common Pleas. (Doc. No. 1-1.) Stein removed the action to this Court on March 29, 2018 on the basis of complete diversity of citizenship. (Doc. No. 1.)

Care, and Good-Faith and Fair Dealing (Count V); (6) Conversion (Count VI); and (7) Accounting (Count VII). (Doc. No. 19.) Defendants filed an Amended Answer as well as a Counterclaim for breach of the payment provisions of the parties' June 2016 Settlement Agreement. (Doc. No. 82.)

The parties subsequently filed cross- Motions for Summary Judgment. (Doc. Nos. 151, 152, 153.) On August 25, 2020, the Court granted summary judgment in Defendants' favor with respect to Plaintiffs' claims for (1) misappropriation of trade secrets (Count II); (2) fraud in the inducement (Count IV); (3) breach of the duties of loyalty and the duty of care (Count V); and (4) conversion (Count VI). (Doc. No. 163.) The Court denied summary judgment with respect to Plaintiffs' claims that Stein breached (1) the non-competition provision of the June 2016 Non-Competition Agreement;[7] (2) the confidentiality provisions in both the June 2016 Settlement Agreement and Non-Competition Agreement; and (3) the cooler prototype provision in the June 2016 Settlement Agreement. (*Id.*) The Court further concluded that that summary judgment was not appropriate, for either party, with respect to Plaintiffs' claim for breach of the implied duty of good faith and fair dealing. (*Id.*) Lastly, the Court granted in part and denied in part Defendants' summary judgment motion with respect to Plaintiffs' tortious interference claim.[8] (*Id.*)

Trial was initially set for March 15, 2021 but had to be postponed several times due to restrictions and constraints imposed as a result of Covid-19. On October 8, 2021, the Court set a final pretrial conference on March 22, 2022 and a trial date of April 11, 2022. (Doc. No. 183.)

---

[7] The Court denied Plaintiffs' summary judgment motion on this claim and denied Defendants' summary judgment motion on this claim with respect to Plaintiffs Williams and AWF. However, the Court granted Defendants' summary judgment motion on this claim with respect to Plaintiffs Industries and Holdings. (*Id.* at p. 24.)

[8] Specifically, the Court held that Defendants were entitled to summary judgment in their favor to the extent that this claim is based on PPM's alleged tortious interference with Plaintiffs' customer contracts and relationships. However, the Court denied summary judgment with respect to Plaintiffs' tortious interference claim to the extent it is based on PPM's alleged interference with the June 2016 Settlement and Non-Competition Agreements. (*Id.* at pp. 43-44.)

7

Defendants filed a number of motions *in limine* on March 1, 2022, including the instant Motions *in Limine* to Exclude Evidence that Stein Allegedly Sexually Harassed Lisa Taylor (Doc. No. 185) and to Exclude Evidence of Plaintiffs' Claim that Stein Altered PPM's Inventory (Doc. No. 186.) Plaintiffs filed Briefs in Opposition on March 15, 2022. (Doc. Nos. 196 - 197.)

The Court conducted a Final Pretrial Conference on March 22, 2022. (Doc. No. 215.) Two days later, Plaintiffs filed a Motion to Continue Trial due to a serious illness in Plaintiffs' lead counsel's family. (Doc. No. 216.) Defendants did not oppose the Motion. (Doc. No. 217.) The Court thereafter conducted a telephonic status conference with counsel, during which it reset the trial in this matter for October 11, 2022. (Doc. No. 218.) The Court advised the parties, however, that it would proceed to rule on the pending motions *in limine* as soon as reasonably practicable.[9]

## II. Legal Standard

Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions *in limine* "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). *See also United States v. Dimora*, 843 F.Supp.2d 799, 816 (N.D. Ohio 2012). Motions *in limine* allow the court to rule on evidentiary issues prior to trial in order to avoid delay and to allow the parties to focus remaining preparation time on issues that will in fact be considered by the jury. *See United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). *See also Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) ("[A] motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.")

---

[9] On May 11, 2022, the Court issued a Memorandum Opinion & Order addressing four of Defendants' Motions *in Limine*. (Doc. No. 223.) The remaining pending motions *in limine* (Doc. Nos. 189, 199) will be addressed in a separate Opinion & Order.

Courts should exclude evidence on a motion *in limine* only when it is clearly inadmissible. *See Dimora*, 843 F.Supp.2d at 816; *Indiana Ins. Co. v. General Elec. Co.*, 326 F.Supp.2d 844, 846 (N.D. Ohio 2004). If the court is unable to determine whether certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id*. Ultimately, the determination whether to grant or deny a motion *in limine* is within the sound discretion of the trial court. *See Dimora*, 843 F.Supp.2d at 816; *Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F.Supp.2d 853, 858 (W.D. Mich. 2008). *In limine* rulings are preliminary, and the district court may change its ruling at trial for any reason it deems appropriate. *See, e.g., Allstate Ins. Co. v. Papanek*, 2020 WL 246418 at * 2 (S.D. Ohio Jan. 16, 2020).

### III. Analysis

#### A. Motion *in Limine* to Exclude Evidence that Stein Allegedly Sexually Harassed Lisa Taylor (Doc. No. 185)

Defendants argue that this Court should exclude any evidence regarding Taylor's sexual harassment allegations under Federal Rules of Evidence 401, 403, and 404(b). (Doc. No. 185.) Defendants assert that this evidence is irrelevant to Plaintiffs' remaining breach of contract and tortious interference claims and that its admission would be unfairly prejudicial, cause jury confusion, and waste time. (*Id*.) Defendants further argue that Ms. Taylor's testimony regarding this issue constitutes improper character evidence under Rule 404(b). (*Id.*)

Plaintiffs argue that Ms. Taylor's sexual harassment allegations are relevant under Rule 401 because "they have a tendency to demonstrate that Stein is not credible and is not of good character and that fact is a consequence to whether he entered into the Settlement Agreement with Jim Williams in good faith." (Doc. No. 197 at p. 6-7.) With regard to Rule 404(b), Plaintiffs argue that this evidence is not prohibited because they are not seeking to introduce it in order to show that Stein "acted in

9

conformity therewith" relative to Plaintiffs' claims at trial. (*Id*. at p. 7.) Even if this evidence did qualify as Rule 404(b) evidence, Plaintiffs maintain that it is admissible to show that Stein had motive for trying to discredit Ms. Taylor and/or that there was an absence of mistake or accident in filing a police report against her and attacking her character. (*Id*.) Lastly, Plaintiffs argue that this evidence is admissible under Rules 607 and 608.

Under Federal Rule of Evidence 401, relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. A court may exclude relevant evidence under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidentiary rulings are made subject to the district court's sound discretion. *Frye v. CSX Trans., Inc*., 933 F.3d 591, 598 (6th Cir. 2019).

The Court agrees with Defendants that evidence regarding Ms. Taylor's sexual harassment allegations is not relevant. This is a breach of contract case between former business partners-- not a Title VII action. The primary issues remaining for trial are (1) whether Stein violated the confidentiality, non-competition, non-disparagement, non-solicitation, cooler prototype, and "fair business practices" provisions of the June 2016 Agreements; and (2) whether PPM tortiously interfered with those Agreements. Whether or not Stein sexually harassed Ms. Taylor is not relevant to establishing any of the elements of these claims. *See, e.g., Marotta v. Ford Motor Co*., 2016 WL 3197425 at * 7 (E.D. Mich. June 9, 2016) (in Title VII action, excluding evidence regarding supervisor's alleged use of drugs at work because it did "not appear to have any relevance to any of the elements of Plaintiff's sexual harassment claims"); *Molinares v. Limon*, 2009 WL 1542896 at *

2 (W.D. Mich. June 2, 2009) (in § 1983 case, excluding evidence of defendant's prior instances of sexual misconduct in the workplace because "this is an excessive force case, not a sexual misconduct case"). Nor is the Court persuaded that Stein's alleged sexual harassment of Ms. Taylor has any relevance to whether he entered into the June 2016 Settlement and Non-Competition Agreements with Plaintiffs "in good faith."

However, if Defendants attempt to attack Ms. Taylor's credibility by painting her as a "disgruntled" employee, the Court is inclined to allow Ms. Taylor to counter these accusations and testify regarding the circumstances surrounding her decision to leave PPM, including her allegations that Stein sexually harassed her. Thus, if Defendants open the door to this evidence, the Court will evaluate, at that time and upon argument of counsel, the admissibility of Ms. Taylor's testimony as rebuttal evidence.

Accordingly, Defendants' Motion *in Limine* to Exclude Evidence that Stein Allegedly Sexually Harassed Ms. Taylor (Doc. No. 185) is granted; however, the Court will consider allowing Plaintiffs to introduce this evidence if Defendants open the door by attempting to attack Ms. Taylor's credibility as set forth above.

    **B.**    **Motion *in Limine* to Exclude Evidence that Stein Altered PPM's Inventory in QuickBooks After he Purchased the Company (Doc. No. 186)**

Defendants next argue that evidence that Stein altered PPM's inventory in QuickBooks should be excluded because it is irrelevant and unfairly prejudicial under Rule 403. (Doc. No. 186 at p. 4.) Defendants also assert that this evidence should be excluded under Rule 404(b) because (1) there is substantial credible evidence that Stein did not, in fact, alter (or instruct Ms. Taylor to alter) PPM's inventory in QuickBooks; (2) admission of such evidence would not give "more or less evidence to

11

Plaintiffs' claim that Stein breached the non-compete;" and (3) there is a substantial risk that admission of this evidence would confuse the jury. (*Id*. at p. 5.)

In response, Plaintiffs argue that evidence that Stein improperly altered PPM's inventory in QuickBooks is relevant to their "plan … to establish that Jeffrey Stein has a pattern and practice of breaching his duty of good faith and fair dealing by manipulating contracts so that the other party cannot get the benefit of its bargain." (Doc. No. 196 at p. 2.) Plaintiffs further argue that this evidence is relevant "because [it] has a tendency to show that [Stein] is not credible and is not of good character." (*Id*. at p. 5.) With regard to Rule 404(b), Plaintiffs argue that this evidence is admissible to show motive, opportunity, pattern and practice, and absence of mistake "in Stein's creative interpretation of the term Business of Wire" in the June 2016 Non-Competition Agreement. (*Id*. at p. 6.) Lastly, Plaintiffs argue (summarily and without citation to any supporting authority) that this evidence is admissible under Rules 607 and 608. (*Id*. at p. 6.)

For the following reasons, Defendants' Motion is granted. In essence, Plaintiffs' argument is that the evidence at issue is relevant because Stein's act of falsely manipulating inventory to eliminate Boykin Manufacturing's benefit of the bargain under the 2017 Asset Purchase Agreement, is consistent with (and/or comparable to) his "creative interpretation" of the language in the 2016 Non-Competition Agreement to deprive Plaintiffs of the benefit of the bargain with respect to that Agreement. (Doc. No. 196 at pp. 2, 5.) As discussed below, however, Plaintiffs have not sufficiently demonstrated that Stein's alleged actions of altering the inventory in QuickBooks and/or throwing inventory away did, in fact, improperly benefit him or otherwise deprive Boykin Manufacturing of the benefit of the bargain under the terms of the 2017 Asset Purchase Agreement.

Neither party attaches the 2017 Asset Purchase Agreement between PPM and Boykin Manufacturing to their respective filings, directs the Court's attention to where this Agreement is located in the record, or identifies any specific provision in that Agreement that purports to adjust the purchase price based on inventory levels. Upon its own review, the Court was able to find a copy of the 2017 Asset Purchase Agreement in the summary judgment record.[10] (Doc. No. 158-40.) The only provision that the Court could find in that Agreement that appears to relate to adjustments to the Purchase Price based on inventory is Section 2.4, which reads as follows:

> 2.4 <u>Inventory Adjustment</u>. At least one business day prior to the Closing Date, Purchaser [Stein/PPM] and Seller [Boykin/Boykin Manufacturing] shall conduct a physical review and count of the inventory of Seller (the "Inventory") and will agree to a value of the same. Inventory will be valued at cost. Prior to one (1) year after Closing[,] Purchaser and Seller agree to reconcile the Inventory and provide Purchaser with reasonable credit for any Inventory the value of which is subsequently determined to vary from the actual cost of manufactured goods, was obsolete, slow moving, or otherwise unusable and Purchaser shall be entitled to a one time credit against the Purchase Money Note in such amount.

(Doc. No. 158-40 at PageID# 7448.)

Without identifying any specific provision or language, Plaintiffs claim that the 2017 Asset Purchase Agreement supports the relevance of Ms. Taylor's testimony, arguing that: "Stein had one year from the date of the sale for the purchase price to be adjusted if the inventory levels were not at the rate estimated in the contract and the asset inventory report what [sic] the parties had decided to use for these adjustments. If the assets were higher than estimated, then Stein would have to pay additional funds to Lynne Boykin under the purchase agreement." (Doc. No. 196 at PageID# 8981.)

---

[10] The 2017 Asset Purchase Agreement references certain exhibits, including a Non-Compete Agreement and Lease Agreement. These Exhibits are not attached to any of the copies of the 2017 Asset Purchase Agreement in the record before this Court.

13

The Court, however, does not construe Section 2.4 of that Agreement in the manner described by Plaintiffs. Specifically, Section 2.4 does not provide that "Stein would have to pay additional funds" to Boykin if the asset inventory report showed inventory levels above a certain amount one year after Closing. Indeed, on its face, Section 2.4 says nothing about an adjustment of the purchase price based on the *amount* of inventory one year after Closing. Rather, that section provides for a reasonable, one-time credit if the *value* of the inventory is "subsequently determined to vary from the actual cost of manufactured goods, was obsolete, slow moving, or otherwise unusable." (Doc. No. 158-40 at PageID# 7448.) Here, Plaintiffs have not directed this Court's attention to any evidence that Stein and/or PPM attempted to negotiate with Boykin for a credit based on the value of the inventory one year after Closing. And, even if there were such evidence in the record, Plaintiffs have not sufficiently explained how altering inventory levels in QuickBooks (and/or throwing away inventory) would necessarily lead to obtaining any such credit. Finally, Plaintiffs have not directed this Court's attention to any other provision in the Agreement that might support their argument.

The parties' briefing on this issue has been far from ideal.[11] However, for all the reasons set forth above and based on the information that is currently before it, the Court preliminarily finds that evidence that Stein altered PPM's inventory in QuickBooks is not relevant to the instant action. Defendants' Motion is, therefore, granted. If, however, Plaintiffs believe that there is a different

---

[11] The Court also does not agree with Defendants' description of the 2017 Asset Purchase Agreement. Defendants argue that "[t]he Purchase Agreement between Stein and the seller did not allow for an adjustment in price based on inventory." (Doc. No. 186 at PageID# 8879.) However, contrary to Defendants' argument, Section 2.4 of the Asset Purchase Agreement does, in fact, allow for an adjustment in price based on inventory, in the form of the potential "one-time credit" set forth above. Both parties are cautioned that, in any further briefing before this Court, they are required to provide accurate and complete citations to the record.

provision of the 2017 Asset Purchase Agreement that applies, they may move to introduce this evidence at trial and the Court will consider the parties' arguments at that time.

## IV. Conclusion

For all the reasons set forth above, Defendants' Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, that Defendant Stein Allegedly Sexually Harassed Lisa Taylor (Doc. No. 185) is granted; however, the Court will consider allowing Plaintiffs to introduce this evidence if Defendants open the door as set forth herein. Defendants' Motion *in Limine* to Exclude Reference, Testimony, or Evidence, of any Kind, of Plaintiffs' Claim that Defendant Stein Altered PPM's Inventory (Doc. No. 186) is granted.

**IT IS SO ORDERED.**

Date: May 16, 2022

                                        *s/Pamela A. Barker*
                                        PAMELA A. BARKER
                                        U. S. DISTRICT JUDGE